Douglas K. KNUTSON et al., Plaintiffs,

v.

The DAILY REVIEW, INC., a corporation, et al., Defendants.

No. C–73–1354–CBR.

United States District Court,
N. D. California.

Sept. 23, 1974.

G. Joseph Bertain, Jr., Timothy H. Fine, William T. Amen, San Francisco, Cal., for plaintiffs.

Broad, Khourie & Schulz, Michael N. Khourie, Thomas Paine, San Francisco, Cal., for defendants.

## MEMORANDUM OF OPINION

RENFREW, District Judge.

Plaintiffs in this antitrust action are independent dealers who purchase, distribute and resell daily newspapers, *The Argus* and *The Daily Review*, in various areas located in Alameda County.[1]

Defendants are two corporations and several individuals. The Daily Review, Inc. ("DRI") is a California corporation organized on November 10, 1953, with its principal place of business at Hayward, California. DRI publishes *The Argus, The Daily Review*, and *The Daily Review Shopping News*, a weekly free shopper. Bay Area Publishing Co.

---

1. Plaintiffs Douglas K. Knutson, Arlen N. Benham, Geoffrey Beaty, Daniel A. Dutra, and Laura Duarte are *Argus* dealers, and plaintiffs Evan Francis Williams, Joseph W. Berthiaume, Kenneth W. Jackson, Jean E. Nyland, Willard B. Kittredge, Robert A. Dutra, and Gayle C. Ely are *Daily Review* dealers.

("BAPCO") is a California corporation organized on June 8, 1960, with its principal place of business in San Francisco, California. BAPCO conducts most of its business at Livermore, California, where it publishes the *Tri-Valley Herald* ("Herald") and the *Tri-Valley News* ("News"). BAPCO is a wholly owned subsidiary of DRI. None of the plaintiffs herein has any relationship, contractual or otherwise, with BAPCO. Floyd L. Sparks is the controlling shareholder of DRI, the president of DRI and BAPCO, and publisher of *The Argus, The Daily Review*, the *Herald*, and the *News*. William Chilcote is the business manager of DRI. Dallas Cleland is the director of circulation of *The Argus, The Daily Review*, the *Herald* and the *News*. John Clark is the assistant circulation manager of *The Daily Review* and promotion manager of *The Daily Review, The Argus*, the *Herald*, and the *News*. Carl Felder, doing business as Felder Enterprises, is an independent contractor engaged in the solicitation of subscribers for newspapers, including those involved in this case.[2]

Plaintiffs have alleged four separate claims for relief, all of which arise under the Sherman Act. First, plaintiffs claim that the provision in their written dealership agreements with the publisher ("Dealer's Agreement"), in effect between December 1, 1969, and September 1, 1973, which requires the dealer to sell the newspaper to the individual subscriber at a price fixed by the publisher (in effect, the resale-resale price) constitutes a vertical price fixing agreement in violation of § 1 of the Sherman Act, 15 U.S.C. § 1. Second, they allege that the unilateral termination provisions of the Dealer's Agreement as well as the other restraints on plaintiffs' ability to sell their businesses and the actual termination of plaintiffs and all other home delivery dealers as of September 1, 1973 amount to unreasonable restraints of trade in violation of Sherman Act § 1. Third, plaintiffs claim that the territorial restraints imposed upon them in the Dealer's Agreement are unlawful under Sherman Act § 1. Fourth, plaintiffs allege that defendants have attempted and conspired to monopolize the publication of community daily newspapers in the southern Alameda County area in violation of § 2 of the Sherman Act, 15 U.S.C. § 2. The complaint prays for preliminary and permanent injunctive relief under § 16 of the Clayton Act, 15 U.S.C. § 26, and for treble damages, costs and attorney's fees under § 4 of the Clayton Act, 15 U.S.C. § 15.

The parties have stipulated and the Court finds that the business involved in this case is either in or substantially affects interstate commerce. The requisite interstate commerce being present, this Court has jurisdiction under 15 U.S.C. §§ 15 and 26.

## I. THE NEWSPAPERS

*The Daily Review* is published daily, in the afternoon Monday through Saturday, and in the morning on Sunday. It circulates in Hayward, San Leandro, Fremont, Newark, Livermore and elsewhere in southern Alameda County. Approximately seventy-five percent of its average paid circulation is within the "City Zone", which as defined by the Audit Bureau of Circulations ("ABC") consists of the corporate limits of Hayward and Union City plus the balance of the Hayward Census Division, Castro Valley Division, and San Leandro Division including that part of San Leandro City comprising Census Tracts 33, 34, 35, 42, 43 and 44. Along with other newspapers, *The Daily Review* is legally adjudicated to carry advertising required by law for transactions within the cities of Hayward and San Leandro, and it is the only newspaper adjudicated to carry legal advertising originating with the political entities of the cities of Hayward and San Leandro. Printed in Hayward, *The Daily Review* has twenty-eight full-time and ten part-time reporters and sixteen advertising salesmen.

---

**2.** On March 15, 1974, the Court dismissed the action as to defendants Carl Felder and Felder Enterprises pursuant to Rule 41(b), Federal Rules of Civil Procedure.

*The Argus* is a morning seven-day daily newspaper circulated in Fremont, Newark, Union City, and elsewhere in southern Alameda County. Approximately ninety percent of its average paid circulation, as reported by ABC, is located within the cities of Fremont and Newark. It is legally adjudicated along with other newspapers to carry legal advertising for transactions within Fremont and Newark, and it is the only paper adjudicated to carry legal advertising originating with the political entities of the cities of Fremont and Newark. *The Argus* is printed in Livermore and employs fifteen full-time reporters and eight advertising salesmen.

The *Herald* (formerly the *Livermore Herald & News)* and the *News* (formerly the *Village Pioneer*) both circulate in the Livermore Valley. The *Herald* is a seven-day morning daily while the *News* is a three-day per week, controlled circulation [3] afternoon paper. Approximately ninety-five percent of the average paid circulation of these papers is within the Primary Market Area consisting essentially of Livermore, Pleasanton, and Dublin, all in Alameda County, and the community of San Ramon in Contra Costa County. The *Herald* and the *News* share with other papers the adjudication for legal advertising within the cities of Livermore and Pleasanton, but they are the only newspapers adjudicated to carry legal advertising originating with the political entities of those two cities. These two papers are printed in Livermore and employ fourteen full-time reporters, five part-time reporters, and eight advertising salesmen.

The following portions of *The Daily Review, The Argus,* the *Herald,* and the *News* are identical: sports page, financial page, editorial page except for one editorial on two days during the week, T.V. log, "Night and Day Around the Bay," and substantial amounts of news and advertising. All of the composition

work for these publications is done in Hayward.

## II. THE INDEPENDENT DEALER SYSTEM

This case focuses on the independent dealer system used by the Sparks' publications and the publisher's attempt to change from that distribution system to one composed of employee dealers ("district managers") and independent carriers. In approximately 1950 Sparks adopted the independent dealer system for distribution of *The Daily Review*. Thereafter this system was used for distribution of each daily newspaper acquired by Sparks or DRI so that in May, 1973, all daily newspapers published by companies owned or controlled by Sparks were distributed to home-delivery subscribers through independent dealers and independent carriers.

Under this distribution system each dealer, including plaintiffs here, purchased his copies of *The Argus* or *The Daily Review* from DRI and resold them for his own account to independent carriers—boys and girls under the age of 18. These carriers, in turn, resold the newspapers to home-delivery subscribers. Each dealer was engaged as an independent contractor pursuant to the terms of a written dealership agreement, not as an employee of DRI. Upon purchase of the newspapers each dealer had complete ownership of, possession of, and dominion over the papers. DRI did not reimburse a dealer for unsold copies, and the dealers had to sustain all losses from carrier defalcations. Each dealer owned such equipment as was necessary for the distribution of the newspapers to the carriers. No dealer under contract to DRI ever paid anything of value to obtain his dealership or carrier organization. These independent dealers derived their profit and paid their expenses from the difference between the price at which they sold the newspapers to their car-

---

3. A controlled circulation newspaper is one which is distributed on a voluntary collection basis, i. e., the home subscriber may choose whether or not to pay the subscription price when called upon by the carrier.

riers and the price at which they purchased the papers from DRI. Rather than being uniform, however, the base rate charged by DRI for the papers varied among the dealers so that each dealer's income would be commensurate with the size, density and difficulty of delivery of his territory. By this means it was intended that each dealer would be able to earn an income which would fairly compensate him for his time and effort expended. This dealer income figure was reached jointly by the dealer and the publisher and then used, along with the set subscription price, the carrier's income (e. g., 57 cents per subscriber per month after October 1, 1969, for *The Daily Review*) and the number of subscribers, to calculate the base rate for the newspaper for each dealer.[4]

Prior to December 1, 1969, DRI used a standard form of dealer's agreement which provided that the dealer would sell newspapers to the subscribers within his route or territory at a fixed subscription price and that the subscription price, the price paid to the publisher by the dealer, and the size and boundaries of the territory were subject to change by the publisher in his sole discretion. The dealer could not assign, transfer or hypothecate rights arising under the agreement without the prior written consent of the publisher. A dispute arose whether under the terms of this agreement certain *Herald* and *News* dealers were independent contractors or employees of the publisher. As a result of this dispute, DRI, with the assistance of the Western Newspaper Industrial Relations Bureau, adopted a new Dealer's Agreement which went into effect on December 1, 1969, and governed the relations between DRI and BAPCO on the one hand and *Daily Review, Argus, Herald,* and *News* dealers on the other until Septem-

ber 1, 1973. That agreement provided in pertinent part:

"That the Company will sell to the Dealer such quantities of Daily Review [Argus, etc.] as he shall order * * * to supply the needs of his territory or route * * *.

* * * *

"That the Dealer will sell the Daily Review [Argus, etc.] at the current subscription rate to his individual subscribers and cause same to be delivered to them each date of publication in a manner consistent with the best interests of both parties to this agreement. That the rate at which the Dealer sells to accounts for resale will be set by himself or through negotiations between himself and the account.

* * * *

"That should the Dealer decide to transfer his rights under this agreement to another party, he will duly advise the Company of his intent sixty (60) days prior to transfer. The Dealer agrees, however, that he will first ascertain that prospective transferee is bondable, has the qualifications and ability necessary to perform all responsibilities under this agreement, to the satisfaction of the Company. The Dealer agrees not to turn territory over to successor until he is fully trained and able to assume responsibilities to the satisfaction of the Company, accounts have been properly audited to permit an orderly transfer with mutual financial protection for parties concerned, and a contract has been executed with the new Dealer.

"That either party hereto may terminate this agreement in its entirety upon the giving of thirty (30) days

---

4. Actually the Dealer's Agreement contained a dual rate structure in which the dealer paid his base rate for all papers ordered up to a certain number and then a second and higher rate for any extra papers ordered. For example, plaintiff Williams' agreement dated January 15, 1973 (Exh. 3) provided that the dealer would pay for his newspapers at the rate of $1.632 per subscriber per month up to and including 1,550 subscribers and at the rate of $1.88 per subscriber per month for all subscribers over 1,550. Nyland's rates as of the November 1, 1972 agreement, on the other hand, were $1.68 up to 1,400 subscribers and $1.88 for any additional subscribers. (Exh. 4.)

advance notice to the other party or less if mutually agreeable." .

During the life of this agreement, all of the independent dealers, including plaintiffs, complied with its terms without any actual or threatened coercive action by the publisher. Prior to September 1, 1973, the *Daily Review* dealers uniformly sold the paper, through their carriers, to subscribers at the publisher's suggested home delivery subscription rate of $2.75 per month, the rate which was in effect between October 1, 1969, and February 1, 1974, when the suggested subscription price was increased to $3.25 per month. Sales to subscribers by *Argus* dealers were also at the publisher's suggested price.[5] Moreover, when the publisher announced an increase in the *Argus* monthly home delivery rate, effective March 1, 1973, from $2.50 to $3.00, all of the dealers acquiesced in this change and uniformly charged the higher rate. On five occasions during the last four years the boundaries of four dealers' territories were realigned, or "split." Again these dealers voluntarily acquiesced in these realignments. At no time prior to May 14, 1973, did any dealer request defendants' consent to transfer, assign or sell his dealership nor has any dealer, including plaintiffs, before or after September 1, 1973, either purchased or sold a dealership of any of the newspapers involved in this litigation.

## III. TERMINATION OF THE INDEPENDENT DEALER SYSTEM AND SUBSEQUENT EVENTS

On May 14, 1973, counsel for plaintiffs wrote a letter to Sparks which alleged that certain provisions of the Dealer's Agreement then in force constituted anticompetitive trade practices and impinged on plaintiffs' status as independent contractors. Specifically, the letter alleged that the following practices established by the Agreement were anticompetitive: resale price maintenance under which the publisher set the rate at which the carrier sold the paper to the subscribing public; the existence of non-uniform rates at which plaintiffs purchased the newspapers from the publisher; territorial restrictions on the dealers; and potential confiscation of the dealer's property rights in his business by means of the thirty-day cancellation provision. This letter suggested that plaintiffs were willing to negotiate a settlement rather than engage in litigation. No response to the merits of these charges was made either by the defendants or their counsel who represented them at that time nor was a reply ever made to plaintiffs' counsel's second letter on this subject dated July 12, 1973.[6]

In a letter dated July 25, 1973, defendants DRI and BAPCO notified all of their respective independent newspaper dealers of the termination of their Dealer's Agreements effective at the close of business on August 31, 1973. The letter indicated that the entire distribution system was being changed from the use of independent dealers to distribution "through the medium of our employees." In the letter Sparks explained that "[t]his action is necessary to obtain closer supervision over our circulation, and in particular over efforts to increase such circulation. In our area we face intense competition from such larger paid circulation newspapers as the Oakland Tribune, the San Francisco Chronicle, and the San Jose Mercury-News and

---

5. There were two instances of carriers in plaintiff Knutson's organization charging more than the "current subscription price" established by DRI for *The Argus*. After being informed of the overcharge by the *Argus* circulation manager, Knutson corrected the error and gave the customers a credit in the amount of the overcharge.

6. Counsel initially retained by defendants apparently took no action for two months. Defendants thereupon retained a second labor counsel who realized the antitrust implications of the May 14, 1973, letter. Subsequently present trial counsel was retained by defendants. By this recitation the Court does not imply that there has been any failure on the part of present trial counsel to represent defendants both promptly and diligently.

additional competition from free distribution newspapers. Any loss in circulation to these or other competitors would adversely affect our advertising revenue." (Exh. 1–C.) The termination letter offered employment as a salaried district manager to each terminated dealer. The letter indicated that as employees the district managers would be covered by such federal and state programs as workmen's compensation, Social Security, unemployment insurance, unemployment compensation disability insurance, and any other programs or benefits required by law. In addition, the employment offer included Blue Cross health insurance, paid vacations and holidays, and a profit sharing plan. Potential district managers were offered a salary of $265 per week (approximately $13,780 annually) and reimbursement for the use of their motor vehicles at the rate of 13¢ per mile.[7]

On August 6, 1973, plaintiffs filed this action and a hearing on plaintiffs' motion for preliminary injunction was set for August 14, 1973. The parties sought and obtained a continuance of the hearing on that motion on several occasions. The motion was finally withdrawn when the parties agreed to a bifurcated trial on the merits with the liability portion of the trial to begin on November 13, 1973. During this period defendants agreed to continue selling newspapers to plaintiffs at the prevailing rate and to hold open the offer of employment pending the Court's decision.

After the trial on liability began as scheduled, the parties agreed to a stipulated "temporary injunction" on December 13, 1973. Defendants were thereby enjoined from refusing to sell *The Daily Review* or *The Argus* to any of the plaintiffs at his present rate, from communicating except in a specified manner with any of plaintiffs' carriers or subscribers about the lawsuit or plaintiffs' prices, and from insulting, harassing or intimi-

dating any of the plaintiffs, their carriers or subscribers until the end of the month in which the court rendered its decision on the liability issues. Plaintiffs were enjoined for the same period of time from insulting, harassing or intimidating any of defendants, their employees or agents, from refusing to provide normal and reasonable distribution service including timely delivery of newspapers and inserts, and from permitting minor children of plaintiffs from entering defendants' plant or premises except for business. It was further agreed and ordered on that date that defendants' offer of employment would remain open until the end of the month in which the Court decided the liability issues, that the defendant newspapers could refuse to hire any plaintiff solely on the grounds of a failure properly to perform his duties, that such refusals could be referred to a designated arbitrator, and that no dealer would be denied employment based on his vigorous participation in the lawsuit. The trial continued until February, 1974. The parties thereafter filed proposed Findings of Fact and Conclusions of Law. Final argument in the liability phase was heard on March 11 and 12, 1974. The Court announced its decision orally and in open court on the last day of argument finding defendants liable under the first claim. The trial on impact and damages began on April 16, 1974, and continued on April 17–19 and 22–25, 1974. The parties then filed proposed Findings of Fact, Conclusions of Law, and post trial memoranda. Final argument was heard on June 17, 1974. The stipulated "temporary injunction" remained in effect throughout the damage phase of the litigation.

Since September 1, 1973, defendants have had a mixed distribution system. On that date sixteen districts of *The Daily Review* were converted from an independent contractor dealer/independent carrier operation to an employee/in-

7. The salary paid DRI district managers was increased in December, 1973, to $275 per week ($14,300 annually). Moreover, under the new system district managers would not

have to work on weekends and therefore would work fewer hours per week than they had as independent dealers.

dependent carrier system under which the carriers contract directly with the publisher.[8] In all of these districts as well as those in which *Argus, Herald,* and *News* dealers became employees, the independent carriers have continued to charge the advertised subscription price for the newspaper at all times to date. Plaintiffs have continued as independent dealers pursuant to defendants' agreement and subsequently pursuant to the stipulated temporary injunction.

Between September 1, 1973, and November 1, 1973, seven plaintiffs increased their prices of *The Daily Review* to their carriers and pursuant to their suggestion their carriers raised the subscription price above that advertised by the publisher. When each such price increase occurred, all professional solicitation for new customers in that district ceased although such solicitation continued in the districts of the employee dealers (district managers). While defendants attempted to persuade these independent solicitors to solicit new subscriptions within the plaintiffs' districts at the new prices specified by the dealer, these solicitors were reluctant to solicit at different prices and when they attempted to do so experienced some confusion and disruption among their staff of solicitors. Defendants encouraged solicitation in plaintiffs' districts because about one third of the total circulation of *The Daily Review* is located within those districts, but defendants were careful to instruct the solicitors to solicit only at the dealer's price in order to avoid any accusation that defendants were trying to coerce the dealers' pricing policy or in-

jure their businesses. To that end Cleland prepared a list of streets located within the districts of price-raising dealers and told the professional solicitors that if they were going to solicit in those areas it had to be at the dealer's suggested price. Defendants did not attempt to prevent their professional solicitors from soliciting at the dealer's price within the price-raising dealer's districts nor have defendants attempted to interfere in any way with plaintiffs' dealerships during the pendency of this action.

## IV. THE ALLEGED ANTITRUST VIOLATIONS

### A. *Vertical Price Fixing*

Plaintiffs' first claim for relief asserts a *per se* violation of § 1 of the Sherman Act, 15 U.S.C. § 1. Citing Albrecht v. Herald Co., 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998, rehearing denied, 390 U.S. 1018, 88 S.Ct. 1258, 20 L.Ed.2d 169 (1968), plaintiffs contend that the Dealer's Agreement provision which requires them (through their independent carriers) to sell the newspapers at "the current subscription rate," which is set by the publisher, amounts to a vertical price fixing agreement. Defendants concede that this contract provision is an agreement to maintain the resale price of the newspaper, but they contend that in the absence of actual coercion of the dealers by the publisher, such agreements to maintain resale prices do not constitute vertical price fixing agreements and therefore should be judged under the rule of reason rather than by the *per se* standards applied generally in

---

8. While the distribution system has been in a state of flux because of the change in counsel and the pendency of this case, as of the date of trial the street sales (vending machine), motor route and retail accounts dealers of The Daily Review have remained as independent contractors even though they were given the same notice of termination as plaintiffs received. William Felder, a street sales dealer has remained as an independent contractor apparently under the terms of the Dealer's Agreement even though he signed a statement on July 30, 1973, accepting employment with DRI. Two motor routes formerly serviced

by dealers who became employees were taken over by two individuals who signed Dealer's Agreements. These Agreements have not yet been signed by DRI, although the new dealers were led to believe that the Agreements would be signed by DRI. The street sales dealers for *The Argus,* the *Herald,* and the *News* also received termination letters but have remained as independent contractors. Since they sell directly to the public the street sales and motor route dealers occupy the same level in the distribution chain as the carriers.

price fixing cases. While defendants do not cite any cases which specifically require coercion as an element in an illegal vertical price fixing arrangement, they argue that actual coercive conduct has been found and relied upon in those cases which hold such vertical price fixing arrangements to be *per se* illegal. Defendants contend that since there is no evidence of coercive conduct by any of the defendants in this case, the holdings of these *per se* cases do not control the outcome here.

It is true that in finding liability in *Albrecht* the Supreme Court did refer to the strong evidence of coercive conduct by the publisher in that case. Albrecht v. Herald Co., *supra* at 149–150, 88 S.Ct. 869, 19 L.Ed.2d 998. Similarly, in Dahl v. Hearst Corp., 1973 Trade Cas., ¶ 74,322 (C.D.Cal.1972), the court concluded that the defendant publisher's actions in response to plaintiff's resale price increase amounted to "coercive tactics and threats designed to force Dahl to require his carriers to sell the Herald-Examiner at the resale prices fixed by defendants in violation of Section 1 of the Sherman Act." Dahl v. Hearst Corp., *supra* at p. 93,488. In both of those cases the dealers had actually increased their resale price, and the publishers had responded by taking action to force the recalcitrant dealer into line or out of business. In the instant case there has been no such coercion; in fact, plaintiffs and all other dealers acquiesced in the fixed retail price throughout the life of the Dealer's Agreement in question.

While the coercion found in *Albrecht* and *Dahl* does not exist here, both of those cases lacked a significant element which is clearly present in this case, namely, an agreement in the form of a written contract which on its face places control of the resale price in the hands of the publisher.[9] Sherman Act § 1 prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade * * *." 15 U.S.C. § 1. The courts in *Albrecht* and *Dahl* relied upon the coercive conduct of the publisher in order to find an illegal "combination" to fix retail prices between the publisher and those who complied with or acquiesced in his wishes. Albrecht v. Herald Co., *supra,* 390 U.S. at 149–150, 88 S.Ct. 869; Dahl v. Hearst Corp., *supra* at 93,488.

This same reasoning underlies the result in United States v. Parke, Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960). In that case a pharmaceutical products manufacturer announced a resale price maintenance policy in its wholesalers' and retailers' catalogues. No actual contract fixing the resale price was entered into by the wholesalers or retailers. When several retailers advertised and sold Parke Davis vitamin products substantially below the suggested minimum retail prices, Parke Davis instituted a program to obtain compliance with its suggested prices. As part of that program Parke Davis advised the wholesalers that not only would it refuse to sell any Parke Davis products to wholesalers who did not observe the catalogue prices but also that it would refuse to sell to wholesalers who sold Parke Davis products to retailers who did not follow the suggested minimum prices. The wholesalers expressed their willingness to comply. All the retailers were similarly advised, but when several re-

---

**9.** In *Dahl* the court made the following finding of fact:

"8. At no time has Dahl made an agreement or contract with Hearst stipulating to the price at which he resells the Herald-Examiner to his carriers or the price at which the Herald-Examiner shall be sold the home subscriber by his carriers." Dahl v. Hearst Corp., *supra* at p. 93,486.

While it is not apparent from the Court's opinion, there was no contract fixing the resale price in *Albrecht*. An amicus brief filed in that case and cited to this court by plaintiffs' counsel during closing argument clearly indicates that there was no contract fixing the resale price in that case. The publisher had merely issued a "written price policy." Albrecht v. Herald Company, 367 F.2d 517, 519 (8th Cir. 1966), rev'd, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968).

tailers continued to sell at below minimum prices, their names were supplied by the manufacturer to the wholesalers who then refused to fill those retailers' orders. When charged with a violation of the Sherman Act, Parke Davis argued that the facts showed nothing more than a unilateral announcement of policy regarding resale prices followed by a simple refusal to deal with those who disregarded that policy, conduct which is lawful under United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). The Court disagreed:

> "In thus involving the wholesalers to stop the flow of Parke Davis products to the retailers, thereby inducing retailers' adherence to its suggested retail prices, Parke Davis created a combination with the retailers and the wholesalers to maintain retail prices and violated the Sherman Act." United States v. Parke, Davis & Co., supra at 45, 80 S.Ct. at 512.

Where, as here, there is an express or implied agreement which places control of the resale price in the hands of the manufacturer or publisher, a search for such combinations by coercive conduct becomes irrelevant. Where, in the context of such vertical relationships, title, dominion and risk with respect to the goods in question have passed to the dealer, the price fixing agreement, whether express, tacit, or implied, is itself illegal. Dr. Miles Medical Co. v. Park & Sons Co., 220 U.S. 373, 398–400, 407–408, 31 S.Ct. 376, 55 L.Ed. 502 (1911); United States v. Parke, Davis & Co., supra, 362 U.S. at 45 n. 6, 80 S.Ct. 503; United States v. Bausch & Lomb Co., 321 U.S. 707, 721, 64 S.Ct. 805, 88 L.Ed. 1024 (1944). "[T]he long-accepted rule in § 1 cases [is] that resale price fixing is a per se violation of the law whether done by agreement or combination." Albrecht

v. Herald Co., supra, 390 U.S. at 151, 88 S.Ct. at 872 (footnote omitted). Here there is such an agreement in the form of a written contract, and it is a per se violation of § 1 even though it fixes the maximum rather than the minimum resale price, ibid. at 152–153, 88 S.Ct. 869; Kiefer-Stewart Co. v. Seagram & Sons, 340 U.S. 211, 213, 71 S.Ct. 259, 95 L.Ed. 219, rehearing denied, 340 U.S. 939, 71 S.Ct. 487, 95 L.Ed. 678 (1951) and even though the agreement is between a single supplier and his many dealers. Albrecht v. Herald Co., supra, 399 U.S. at 152 n. 8, 88 S.Ct. 869.

## B. The Terminations

In their second claim for relief plaintiffs contend that DRI and BAPCO have combined and conspired to deprive plaintiffs of their contract right to transfer and sell their newspaper distribution businesses [10] and to appropriate and convert these businesses, including the distribution organizations, subscribers and good will of each business, to defendants' own use without just compensation. This deprivation and appropriation allegedly occurred when, pursuant to the thirty-day termination clause in the Dealer's Agreement,[11] defendants terminated their entire independent dealer system for home delivery thereby preventing plaintiffs from realizing the asserted value of these businesses by sale or transfer either to the publisher or to a third party who desired to enter the distribution business as an independent contractor. Plaintiffs assert that this combination or conspiracy had both an anticompetitive purpose, namely to increase the publisher's control over the subscription price of his newspapers, and the anticompetitive effects of depriving the public of an independent competitive level in the distribution of these newspapers and depriving plaintiffs of the market value of their business. Relying

---

10. Plaintiffs contend that the dealer's proprietary interest in his business and his right to transfer that interest were recognized by defendants when specific transfer provisions, not found in the old Dealer's Agreement, were added to the Dealer's Agreement of December

1, 1969. For the text of the transfer clause see p. 1352, supra.

11. For the text of the termination clause see pp. 1352–1353, supra.

on Industrial Bldg. Materials, Inc. v. Interchemical Corp., 437 F.2d 1336, 1342 (9th Cir. 1971), plaintiffs argue that because of these anticompetitive effects and purpose, the combination or conspiracy which resulted in their terminations is an unreasonable restraint of trade in violation of § 1 of the Sherman Act. In their complaint plaintiffs apparently advance the additional contention that the termination and transfer provisions of the Dealer's Agreement were themselves so restrictive that on their face these provisions unreasonably restrained the transfer of dealerships in violation of § 1 of the Sherman Act. This assertion was not stressed at trial, however; nevertheless the Court will address this contention briefly below.

Defendants' response is twofold. First they take the position that there can be no combination or conspiracy here between DRI and BAPCO since the decisions to terminate about which plaintiffs complain were made by only one individual, Sparks, the common president and controlling owner of these two corporations, who made independent decisions for each corporation. At worst, defendants contend, the proof demonstrates nothing more than conscious parallelism which by itself does not establish an illegal combination or conspiracy. Theatre Enterprises v. Paramount, 346 U.S. 537, 540–541, 74 S.Ct. 257, 98 L.Ed. 273 (1954); Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71, 84–85 (9th Cir. 1969), cert. denied, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755, rehearing denied, 397 U.S. 1003, 90 S.Ct. 1113, 25 L.Ed.2d 415 (1970); Independent Iron Works, Inc. v. United States Steel Corp., 322 F.2d 656, 661 (9th Cir.), cert. denied, 375 U.S. 922, 84 S.Ct. 267, 11 L. Ed.2d 165 (1963). Second, defendants contend that the change in the distribution system was effected for the valid business reason of avoiding any anti-trust violation which might have existed in the Dealer's Agreement while maintaining as much influence over the subscription price as the law would allow. Given the interrelationship of subscription price, circulation, and advertising revenues, defendants assert that the change in distribution system and the attendant terminations were reasonable actions.

The Court finds that since Sparks alone made the decision to change distribution systems and terminate all independent dealers for both DRI and BAPCO,[12] there was no combination or conspiracy between DRI and BAPCO to restrict plaintiffs' transfer rights and appropriate plaintiffs' businesses. The Court also finds that even if there had been the requisite combination or conspiracy, plaintiffs have not established by a preponderance of the evidence that defendants' change of distribution system which resulted in the termination of plaintiffs' independent businesses was, in the circumstances of this case, an unreasonable restraint of trade. Nor have plaintiffs proved that the transfer and termination provisions of the Agreement themselves unreasonably restrained trade.

█ In their effort to establish the combination or conspiracy required as the basis of a Sherman Act § 1 violation, plaintiffs contend that any time the common owner or any responsible common executive of more than one corporation makes the same decision at the same time for each of those corporations, that decision-making act establishes the necessary concerted action. As authority for this proposition, plaintiffs cited during final argument United States v. Yellow Cab Co., 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947); Timken Co. v. United States, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951); Kiefer-Stewart Co. v. Seagram & Sons, 340 U. S. 211, 71 S.Ct. 259, 95 L.Ed. 219, re-

12. See November 30, 1973, Reporter's Transcript (hereafter Tr.), pp. 3–4. Inexplicably the Reporter's Transcript in this case does not have common or uniform pagination. Often, but not always, the numbering of the pages would start at the beginning of each trial day.

hearing denied, 340 U.S. 939, 71 S.Ct. 487, 95 L.Ed. 678 (1951); and Perma Mufflers v. Int'l Parts Corp., 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968). With respect to the issue of common ownership, these cases merely hold that common ownership and control do not immunize corporations from the impact of the antitrust laws in cases where a contract, combination or conspiracy has already been or could be established on other grounds, such as the actual agreements in *Timken*, the statements and conferences indicating the common design and understanding in *Kiefer-Stewart*, or the allegations of actual conspiracy taken as true on the motion to dismiss in *Yellow Cab*. None of these cases is support for the proposition that common ownership alone establishes the existence of the requisite combination or conspiracy. The better rule, and the one which this Court adopts, is that relied upon in Windsor Theatre Co. v. Walbrook Amusement Co., 94 F.Supp. 388, 396 (D.Md.1950), aff'd, 189 F.2d 797 (4th Cir. 1951), where the district court held that since there was "no evidence that the activities of the two defendant corporations were directed or caused by any one other than Thomas Goldberg who was the president and chief executive of both corporations", there could be no "meeting of two or more minds" and therefore no conspiracy between the two corporations. Plaintiffs here have presented no evidence other than Sparks' decision, such as the active participation of other corporate officers or agents in this decision, which would support a finding that DRI and BAPCO combined or conspired to violate § 1, and therefore, plaintiffs' second claim for relief fails to satisfy one of the essential elements of Sherman Act § 1.[13]

Assuming *arguendo* that a combination or conspiracy did exist, plaintiffs have nonetheless failed to prove by a preponderance of the evidence that either the transfer and termination clauses in the Dealer's Agreement or the actual terminations under the circumstances of this case were unreasonable restraints of trade.[14] Plaintiffs rely heavily on Industrial Bldg. Materials, Inc. v. Interchemical Corp., 437 F.2d 1336 (9th Cir. 1971), which is, they contend, "[t]he leading case" on the question of conversion from independent dealer to direct distribution and "closely analogous to the instant case * * *." Plaintiffs' Trial Brief, p. 22. That reliance, however, is not well placed.

In *Industrial*, defendant Interchemical Corporation's Presstite Division (Presstite) bypassed its formerly exclusive distributor, Industrial, and distributed its sealing products directly to Industrial's customers thereby competing with and eventually eliminating Industrial as a distributor. The case is replete with allegations of price discrimination and unfair practices used by Presstite to lure customers away from Industrial. In framing the precise issue to be decided, the court noted that "[i]n this case * * * there is an allegation that Presstite, instead of merely refusing to deal with Industrial, sought to drive it out of business by unlawful means." Industrial Bldg. Materials, Inc. v. Interchemical Corp., *supra* at 1341. Presstite had competed directly with its own distributor, and the court relied on that fact to distinguish those cases which held that a manufacturer is free to agree with others to replace a distributor: "In each of those cases, however, the manufacturer did not enter into competition with the distributor, and there was no removal of a competitor of the manu-

---

13. In their first claim plaintiffs also alleged a horizontal combination or conspiracy between DRI and BAPCO to fix the wholesale price of newspapers. That allegation rested solely on the actions and decisions of Sparks as common owner of both corporations, and therefore, it too fails for lack of sufficient proof of a combination or conspiracy between the two corporations.

14. Plaintiffs' allegation that the transfer and termination provisions are themselves unreasonable restraints of trade must be considered irrespective of the existence of a combination or conspiracy since these provisions appear in the Dealer's Agreement itself, clearly a "contract" for § 1 purposes.

facturer from the market." *Ibid.* at 1342. Unlike Presstite, defendants here engaged in no predatory conduct directed against the dealers and never intended to compete against their own dealers by .instituting a mixed system for home delivery circulation involving both independent dealers and employee district managers.[15]

■ The court in *Industrial* was also concerned about the allegation that Presstite had monopoly power over the industrial sealant industry. This allegation was, in the court's view, at least sufficient to raise the likelihood of a restraint on trade in Presstite products. Yet plaintiffs here have not established nor have they attempted to establish with precision either the relevant market or defendants' position in that market.[16] As a result, the Court cannot rely here on the inferential anticompetitive effects of dominant market power as did the court in Industrial.

Thus plaintiffs have failed to establish in this case any of the three factors —unfair tactics, direct competition by the manufacturer with his distributor, or dominant market power—on which the court in *Industrial* relied when it reversed the summary judgment which had been entered in defendant's favor on the § 1 claim. Moreover, that court specifically reserved the precise question before this court, namely, whether the antitrust laws preclude "a manufac-

turer from ever replacing a system of independent distributors with its own system of direct sales and of soliciting customers on its own." Industrial Bldg. Materials, Inc. v. Interchemical Corp., *supra* 437 F.2d at 1343.

■ The authorities cited by defendants persuade the Court that a manufacturer does not violate the antitrust laws simply by discontinuing his dealings with a particular distributor. "Thus, a manufacturer may discontinue a relationship, or refuse to open a new relationship for business reasons which are sufficient to the manufacturer, and adverse effect on the business of the distributor is immaterial in the absence of any arrangement restraining trade or competition." Ricchetti v. Meister Brau, Inc., 431 F.2d 1211, 1214 (9th Cir. 1970), cert. denied, 401 U.S. 939, 91 S. Ct. 934, 28 L.Ed.2d 219 (1971). A manufacturer can lawfully agree with a third party to give him an exclusive distributorship even if this means cutting off another distributor. Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., *supra* 416 F.2d at 76. To hold otherwise would be to saddle forever a manufacturer or supplier with the services of a particular distributor. Cartrade, Inc. v. Ford Dealers Adv. Ass'n, 446 F.2d 289, 294 (9th Cir. 1971), cert. denied, 405 U.S. 997, 92 S.Ct. 1249, 31 L.Ed.2d 465 (1972). Nor is a manufacturer forever bound to use the same system of distribution when sound busi-

---

15. To the extent that DRI and BAPCO now have such a mixed distribution system, it is the product of the stipulation and order pending the outcome of this lawsuit, and the existence of the current arrangement has no relevance to the question of the purpose and effect of the employee system which was to have gone into effect on September 1, 1973.

16. While plaintiffs contend that the relevant product and geographic markets are community or suburban daily newspapers in specified areas of southern Alameda County where defendants publish the only community daily papers, the Court finds that this asserted market definition fails to take into account the cross-elasticities of demand among the community, satellite and metropolitan daily newspapers which circulate in southern Alameda

County as well as the other media (television, radio, and free and controlled circulation papers) which compete for advertising in that area. *See* United States v. duPont & Co., 351 U.S. 377, 393–400, 76 S.Ct. 994, 100 L.Ed. 1264 (1956) ; United States v. Grinnell Corp., 384 U.S. 563, 571–576, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966) ; Plastic Packaging Materials, Inc. v. Dow Chemical Co., 327 F.Supp. 213, 229–230 (E.D.Pa.1971) ; United States v. Chas. Pfizer & Co., 246 F. Supp. 464 (E.D.N.Y.1965). (Although these are Sherman Act § 2 cases where, at least for a monopolization claim, market definition is an essential element of proof, the standards for market definition enunciated in these cases serve as relevant guidelines here as well).

ness considerations suggest that a different method be used. Thus, a manufacturer can lawfully terminate an independent distributor and thereafter sell exclusively through its own outlets. Bushie v. Stenocord Corp., 460 F. 2d 116 (9th Cir. 1972); Ark Dental Supply Co. v. Cavitron Corp., 461 F.2d 1093 (3d Cir. 1972) (decision of defendants, a parent and its subsidiary, to sell their products, only through the parent's sale division, thereby excluding sales by independents such as plaintiffs, did not violate § 1 of the Sherman Act).

██ The defendants sought to make just such a change in their distribution system, and they merely exercised their contractual right to terminate the dealers to effect that change. Nevertheless Bushie v. Stenocord Corp., *supra,* and the other authorities which permit terminations are not dispositive of the instant case since each one permits such terminations only so long as there is present no anticompetitive intent or no resultant effect which unreasonably restrains trade. Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., *supra* 416 F.2d at 76–80; Bushie v. Stenocord Corp., *supra* 460 F. 2d at 119–120; Alpha Distrib. Co., Inc. v. Jack Daniel Distillery, 454 F.2d 442, 452 (9th Cir. 1972); Cartrade, Inc. v. Ford Dealers Adv. Ass'n., *supra* 446 F.2d at 293; Ricchetti v. Meister Brau, Inc., *supra* 431 F.2d at 1214. See also Chisholm Brothers Farm Equipment Co. v. International Harvester Co., 498 F.2d 1137, 1143 (9th Cir. 1974). Therefore the Court must look to the particular facts of this case to determine whether or not the instant contract provisions or the terminations of plaintiffs which occurred pursuant to DRI's decision to change its entire distribution system were unreasonable restraints of trade either because defendants had an anticompetitive purpose or because the actions themselves had unreasonable anticompetitive effects. This analysis of the reasonableness of the particular restraint in question, "includes consideration of the facts peculiar to the business in which the restraint is applied, the nature of the restraint and its effects, and the history of the restraint and the reasons for its adoption." United States v. Topco Associates, 405 U.S. 596, 607, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972); Chicago Board of Trade v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683 (1918).

██ Turning first to the contract provisions themselves,[17] plaintiffs have failed to prove that the transfer and termination provisions were based on an anticompetitive purpose or had actual anticompetitive effects. Although interstate commerce is affected by the publication, distribution, and sale of the newspapers in question, it is not clear that the transfer of a local newspaper dealership from one individual to another within the same locality has any effect, much less a " 'not insubstantial effect' ", on interstate commerce. *Cf.* Cartrade, Inc. v. Ford Dealers Adv. Ass'n., *supra* 446 F.2d at 292–294. Even if such an effect is assumed, the evidence in this case does not support a finding that these provisions violate § 1. These clauses are actually less restrictive than those contained in the Dealer's Agreement in effect prior to December 1, 1969.[18] Rather than resulting from an anticompetitive intent, the change to the new language was made to insure the dealer's rights to transfer his contractual interest and thus to confirm the dealer's status as an independent contractor. Given the publisher's legitimate concern for the quality and speed

---

17. See p. 1352, *supra.*

18. That agreement provided in pertinent part:
"That he [the dealer] will not assign or transfer or hypothecate this agreement or any rights thereunder or interest therein without the written consent of the Company first given, it being expressly understood that any attempt to effect such an assignment or transfer or hypothecation without such consent shall create no rights in the person to whom the same shall be made, and shall constitute grounds for immediate cancellation and termination of this agreement at the option of the Company."

of service provided by his dealers, the restrictions on transfer which enable the publisher to verify the character and financial responsibility of the transferee, and the termination provision which enables either party to extricate himself from an unsatisfactory situation cannot be said on the basis of the record in this case to have had such anticompetitive effects that they constitute unreasonable restraints of trade.

 Plaintiffs' more substantial allegation is that the actual terminations of their dealerships violated § 1 because they were motivated by an anticompetitive purpose and because they had the following anticompetitive effects: (1) elimination of distributors who are independent of the publisher; (2) appropriation of the fair market value of plaintiffs' businesses without compensation which leaves plaintiffs without the financial ability to continue in business as distributors of other newspapers; and (3) further strengthening of defendants' already dominant market position.[19] The Court finds, however, that plaintiffs have failed to prove by a preponderance of the evidence that defendants had such a purpose or that the changeover had such anticompetitive effects.

On the basis of the entire record in this case the Court finds that the wholesale distribution system of defendants' newspapers was not changed for the anticompetitive purpose of maintaining or extending unlawful control by defendants over the subscription price of their newspapers. Sparks testified that the new system was adopted to eliminate the practices which had been claimed to be unlawful to enable the publisher to remain competitive by maintaining as much flexibility in his operations as possible and as much influence over the circulation of the newspapers as the law would permit. (November 16, 1973, Tr., pp. 139–141, 146. Having observed Sparks during the trial and after careful evaluation of his credibility, the Court is satisfied that his decision to convert the distribution system was an honest effort to adopt a distribution plan which would be commercially sound and which would comply with the antitrust laws. This conclusion is reinforced by the fact that defendants sought to convert all of their home-delivery dealers to employees; defendants did not merely terminate a few errant dealers as punishment for their failure to adhere to defendant's pricing policy. Cf. Albrecht v. Herald Co., supra; Dahl v. Hearst Corp., supra.

Defendants' newspapers derive their revenues both from the sale of newspapers and from the sale of advertising. Generally, revenues from advertising are more significant than those from newspaper sales, and newspaper owners, in developing an over-all business strategy, are much more interested in the profitable flow of advertising revenue than in circulation revenue. Defendants' newspapers clearly conform to this pattern since they derive approximately 88% of their revenues from advertising

19. While these are the very effects which concerned the court in Industrial Bldg. Materials, Inc. v. Interchemical Corp., supra, the inquiry into the existence of an unreasonable restraint of trade in these circumstances is primarily a factual one. Alpha Distrib. Co., Inc. v. Jack Daniel Distillery, supra 454 F.2d at 452. Each case must be decided on the basis of its facts rather than by means of the automatic application of labels taken from previous cases. "[I]t should be remembered that this Court has often announced that each case arising under the Sherman Act must be determined upon the particular facts disclosed by the record, and that the opinions in those cases must be read in the light of their facts and of a clear recognition of the essential differences in the facts of those cases, and in the facts of any new case to which the rule of earlier decisions is to be applied." Maple Flooring Assn. v. United States, 268 U.S. 563, 579, 45 S.Ct. 578, 583, 69 L.Ed. 1093 (1925) ; Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., supra 416 F.2d at 78–79. Because Industrial Bldg. Materials was based on facts not found in this case, see pp. 1359–1360, supra, the automatic application of the anticompetitive effects noted in that case in order to find liability here clearly would be improper.

and approximately 12% from circulation.

The advertising revenues of a newspaper are, of course, a function of the quantity of advertising space purchased by advertisers which in turn is influenced by the following factors among others: (a) price of advertising, (b) circulation, (c) quality of newspaper product, (d) availability of run of press color, and (e) level of advertising selling effort. The first two of these factors, price of advertising and circulation, are the most important since advertisers are chiefly concerned with the cost to them per relevant exposure to potential buyers. Advertisers have access to statistics in the form of audit reports, surveys and representations from certain media concerning the percentage of households in given areas reached or claimed to be reached by each newspaper, television or radio station, and magazine. This rate of penetration, determined largely on the basis of circulation within a specific geographic area in the case of newspapers, along with the per inch cost of advertising space is of paramount importance to advertisers in their purchasing decisions.

Circulation, and hence the newspaper's rate of penetration, may vary with the subscription price of the newspaper. Circulation generally will decrease after an increase in the subscription price unless the publisher or someone else reallocates his resources in order to influence or control such a result, for example, by increasing expenditures for the solicitation of new subscriptions or increasing the quality of the product. Assuming that such a reallocation cannot be profitably undertaken or that it is ineffective, circulation will decline when the subscription price increases and advertising demand will therefore decline resulting in a reduction of the advertising space carried by the newspaper. This reduction will make the newspaper less desirable to subscribers which in turn will decrease circulation and lead to a further loss of advertising demand. Dr. Rosse, a well-qualified expert in the field of newspaper economics testified that as a result of this process, a publisher, such as defendants here, whose revenues are derived approximately 88% from advertising and 12% from circulation could expect a loss of total revenue in the vicinity of 40% if the subscription price for 100% of his circulation were increased by 10%. (February 12, 1974, Afternoon Tr., pp. 27–30.) While the court does not adopt the precise figures contained in this testimony, it does find that there is an interrelationship between loss of circulation and advertising revenue. The precise effect on total revenue of any particular increase in the subscription price will depend on the amount of the increase and the percentage of the circulation which is selling at the increased price. For these reasons the publisher is vitally concerned with the subscription price because of its integral relationship to the whole revenue structure and ultimate profitability of the newspaper. The publisher is also interested in having a uniform subscription price since that uniformity facilitates the promotion of circulation and avoids hostility toward the newspaper from subscribers who are paying more for the paper than are other subscribers.

The profits of independent dealers are derived, on the other hand, solely from circulation. They have no direct financial interest in the advertising revenue received by the publisher and derive no income from such advertising payments. These independent contractors have little, if any, knowledge about or interest in the overall revenue structure of the newspaper or the effects which an increase in the subscription price will have on the other operations of the newspaper, such as advertising space, editorial quality of the paper or quantity of news and features. While they are, no doubt, concerned about the general economic welfare of the newspaper, the independent dealer's paramount interest is in maximizing his own profits which are derived exclusively from circulation. Thus an increase in the subscription

price may ultimately reduce the publisher's profits, even though such an increase may increase an individual dealer's revenue and profits. Even if circulation declined, the resulting reduction in a dealer's overhead might enable him to maintain a steady profit with less effort on his own part. Thus the publisher's and the dealer's attitudes toward the subscription price are not parallel and under some circumstances may be directly in conflict.[19A] Moreover, since the additional revenues generated by dealer-initiated price increases are retained by the dealer, the publisher has no additional revenue for financing his efforts to intensify promotional activities in order to maintain his circulation and advertising revenue at a constant level.

In the San Francisco Bay Area, the defendant newspapers are properly categorized as suburban newspapers. However, since the Bay Area is a metropolis which includes a major city, two so-called satellite cities, Oakland and San Jose, each with its own metropolitan newspaper, and many suburban communities, defendant newspapers compete with metropolitan newspapers, satellite city newspapers, and neighboring suburban newspapers. Defendant newspapers compete for circulation and advertising with the *Oakland Tribune, San Francisco Chronicle, San Francisco Examiner, San Jose Mercury-News (Argus* only), *Contra Costa Times, Valley Times, Pleasanton Times, Valley Pioneer, Alameda County Observer, The Friday Observer, The Dollar Saver,* preprints, circulars, and direct mail advertising printed and distributed by advertisers and potential advertisers within the areas of circulation of defendants' newspapers. Defendant newspapers may also be competitive for both public attention and advertising dollars, with a number of commercial and noncommercial television and radio stations and many national, regional and local magazines. All of these media and others penetrate defendant newspapers' area of circulation.[20]

Defendants Sparks and Cleland testified that there appears to be no economically feasible alternative to home delivery of daily newspapers containing current news, entertainment, and advertising features in urban areas other than by independent contractor carriers, who receive considerably less than the minimum wages the law would require if such carriers were employees. In their opinion carrier-delivery is essential to the maintenance of home delivery.

In light of these circumstances, Sparks' decision, made on or about July 15, 1973, for both DRI and BAPCO, to terminate all independent contractor wholesale dealers and transfer their functions to company employees cannot be said to have been made for the anticompetitive purpose alleged by plaintiffs. The Court finds credible Sparks' testimony that his decision was made to ensure that his businesses were in full compliance with the law and to maintain simultaneously the greatest degree of influence which the law would allow over all aspects of the circulation of the newspapers, including not only influence over the subscription price but also over the frequency of publication, method of payment, type of distribution (paid, controlled or free), etc. Sparks desired influence in these areas in order to meet the competition to and preserve the financial integrity of the newspapers. The fact that the new system was based, in part, on defendants' belief that adolescent carriers would be less likely to deviate from the publisher's suggested price does not constitute sufficient proof of an intent to continue a resale price-fixing policy. Instead it supports defendants' position that the new system would be viable without resort to price fixing or coercion. First, the subscription price is less important to the young carriers who do not depend for their entire livelihood on their paper routes, and,

---

**19A.** In the long run, however, their interests tend to coincide.

**20.** See Exhs. FF–4, FF–5, FFF, and KKK. *But see* 82 Harv.L.Rev. 319, 320–322 (1968).

second, the magnitude of the impact upon circulation resulting from a deviation by an individual carrier with his relatively small number of papers would be far smaller than that caused by an independent dealer's price increase.[21] The new contracts in effect between the carriers and the newspapers contain no reference to the subscription price, and there is no credible evidence that since September 1, 1973, defendants have done anything more than suggest a subscription price to the carriers. On the basis of the evidence herein the Court finds that the change in distribution system was not motivated by an anticompetitive purpose but rather was implemented for the purpose of terminating the previous system whose legality had been challenged.

The existence of a sound business reason however is not enough to avoid an antitrust violation. "The antitrust outcome does not turn merely on the presence of sound business reason or motive * * * [O]ur inquiry cannot stop at that point. Our inquiry is whether, assuming nonpredatory motives and business purposes and the incentive of profit and volume considerations, the effect upon competition in the market place is substantially adverse. The promotion of self-interest alone does not invoke the rule of reason to immunize otherwise illegal conduct. It is only if the conduct is not unlawful in its impact in the marketplace or if the self-interest coincides with the statutory concern with the preservation and promotion of competition that protection is achieved." United States v. Arnold, Schwinn & Co., 388 U.S. 365, 375, 87 S.Ct. 1856, 1863–1864, 18 L.Ed.2d 1249 (1967); Anderson v. American Automobile Association, 454 F.2d 1240, 1246 (9th Cir. 1972). Plaintiffs' allegations of anticompetitive impact, or effect on the marketplace, however, have not been established by a preponderance of the evidence.

Plaintiffs have failed to prove that there was, in fact, actual intrabrand competition among the independent dealers as to price or service. On the contrary, the parties have stipulated that at no time prior to September 1, 1973, did any of plaintiffs' carriers charge more for home delivery than the subscription price advertised by the publisher. More significantly, even after September 1, 1973, there has been no competition among plaintiffs with respect to price or territory except for a few isolated instances where one dealer placed a vending machine in the territory of another dealer. Even without the independent wholesale dealers, subscribers are protected from overreaching by the publisher by the fierce competition for advertising revenues which are based upon circulation. Thus in order for the publisher to maximize his circulation he must keep the subscription price as low and the delivery service as good as possible. There is also active competition for circulation from other newspapers and other news media.

While counsel argued that independent dealers can be used to distribute competitive newspapers, plaintiffs have never demonstrated a willingness or desire to provide such distribution. Plaintiffs Williams and Berthiaume were contacted by the managing editor of *The Friday Observer* who sought to utilize their distribution organizations for his weekly paper, but neither plaintiff undertook the distribution of this competing newspaper. Nor have plaintiffs proved that the start-up costs of a distribution business are such that, if they do not accept employment with DRI, they could not undertake the distribution of another newspaper. No covenant not to compete after termination was contained in the Dealer's Agreement.

The alleged appropriation of the value of plaintiffs' businesses has not been proved to have had such an adverse effect that the change of system would constitute an unreasonable restraint of trade. Given the generous offer of employment which accompanied the termination notice and the speculative value of these businesses,[22] plaintiffs have failed to

---

21. See Sparks, November 30, 1973, Tr., p. 33; Cleland, November 13, 1973, Tr., p. 166.

22. See Section V, *infra*.

prove that the terminations were unreasonable within the purview of § 1. In Noble v. McClatchy Newspapers, 1972 Trade Cas. ¶ 73,957 (N.D.Cal.1972), the court submitted to the jury the question of whether the refusal of a publisher to permit its dealer to sell his dealership, after being notified of his termination, was the result of a contract, combination or conspiracy in unreasonable restraint of trade. In light of all the circumstances in that case, which unlike the instant case did not include a complete conversion of the distribution system and termination of all dealers, the jury found that the termination was lawful but that the refusal to permit a sale was a violation of § 1 of the Sherman Act. In this case, however, the Court has decided the latter issue adversely to plaintiffs.

 Plaintiffs' proof on their third alleged anticompetitive effect is also inadequate. To prove that a particular action is unreasonable because it tends to strengthen an already dominant market position, one must first establish that dominance by defining the relevant product and geographic markets and defendants' precise position in those markets.[23] In Industrial Bldg. Materials, Inc. v. Interchemical Corp., *supra* on which plaintiffs rely, there were allegations that Presstite had monopoly power in the industrial sealant industry or at least a dominant position in that market. In reversing the summary judgment granted in Presstite's favor, the Court of Appeals gave plaintiff the opportunity to prove those allegations to support its claim that its termination was unlawful. Plaintiffs here have had that opportunity, but they have not adequately defined the relevant market by identifying those news and advertising sources which are reasonably interchangeable with defendants' newspapers. In light of the competition in the dissemination of news and advertising which does exist between Bay Area newspapers—large and small —and which may also exist among newspapers, radio, television and direct advertising by mail and handouts, plaintiffs have failed to prove that the suburban newspaper market, in which defendants by definition have a dominant position, is indeed the relevant market or submarket. *Cf.* Bowen v. New York News, Inc., 366 F.Supp. 651, 675–676 (S.D.N.Y.1973).[24]

 The terminations complained of here were determined necessary by the publisher to change the system of distribution of his newspapers in order to avoid the antitrust violations alleged to exist in his old system while at the same time maintaining as much influence over

---

23. See note 16, *supra.*

24. In *Bowen* the court rejected defendant's attempt to include television and other media within the relevant market and cited two cases which held that the daily newspaper is a distinct line of commerce since it occupies a unique position with no real substitute. Bowen v. New York News, Inc., *supra* at 675 n. 56, *citing* United States v. Citizen Publishing Co., 280 F.Supp. 978, 985–987 (D. Ariz.1968), aff'd, 394 U.S. 131, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969), and United States v. Times Mirror Co., 274 F.Supp. 606, 617 (C.D.Cal.1967), aff'd mem., 390 U.S. 712, 88 S.Ct. 1411, 20 L.Ed. 252 (1968). It is clear, however, that in each of the cited cases the definition of the relevant market was a factual determination based on the specific facts in the record. In the *Citizen Publishing Co.* case, for example, this determination was based upon a large number of specific findings of fact about the size, content and distribution of other newspapers in the Tucson area, the number of radio and television stations in the Tucson area and their news coverage and advertising content, the preferences of consumers and advertisers, the differences in cost, production and content of radio-television advertising as compared with newspaper advertising, etc. United States v. Citizen Publishing Co., *supra* 280 F.Supp. at 984–992. Market definitions expressed in general terms but based on such specific findings cannot be applied blindly to other cases. The Bay Area, with its metropolitan, satellite city, and suburban newspapers, its large number of TV and radio stations, its heterogeneous population, and its unique geography, is a far different factual setting than Tucson or southern California. Plaintiffs simply have not presented evidence sufficient to enable the Court to make the kinds of specific factual findings required to define a relevant market and to assess defendants' position in that market.

the circulation of his papers as the law would allow, an influence necessitated by the economic realities of the newspaper business. *Cf.* Instant Delivery Corp. v. City Stores Co. (Lit Bros. Div.), 284 F. Supp. 941, 947 (E.D.Pa.1968); Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., *supra* 416 F.2d at 79. In the particular circumstances of this case, the record does not permit a finding that the change in distribution system and the resulting terminations of plaintiffs had either the anticompetitive purpose or effects necessary to render those actions unreasonable restraints of trade in violation of § 1 of the Sherman Act.[25] The decision herein must not be interpreted, however, as providing publishers with a *carte blanche* with respect to the operations of their distribution systems. The question of whether any particular act is unreasonable under the Sherman Act must be decided on the basis of the facts and circumstances of each case. See note 19, *supra*.

## C. *Territorial Restraints*

Plaintiffs' third claim for relief charges that defendants have contracted and combined with their independent dealers to impose and enforce territorial restraints on the resale of defendants' newspapers. Since defendants sell the newspapers to the dealers thereby parting with title, risk and dominion, plaintiffs claim that such territorial restrictions are *per se* violations of § 1, citing as authority United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967). Plaintiffs present as evidence of the existence of territorial restrictions the language of the Dealer's Agreement, the "splits", or divisions, of several of plaintiffs' territories, and defendants' dual rate structure for the wholesale purchase of newspapers.

Defendants contend that the system of territories or routes created by the Dealer's Agreement merely created lawful areas of primary responsibility for each dealer which facilitated the processing of any complaints, start or stop orders, or any other documents or information concerning service or subscribers. Defendants contend that they never engaged in any conduct designed to prevent sales of newspapers to potential customers located outside the boundaries of any dealer's district. Defendants also suggest that United States v. Arnold, Schwinn & Co., *supra*, may not establish a blanket *per se* rule against territorial and customer restrictions on resale. *See, e. g.*, Albrecht v. Herald Co., *supra*, 390 U.S. at 154–156, 88 S.Ct. 869 (Douglas, J., concurring); Anderson v. American Automobile Association, *supra*, 454 F.2d at 1244; Tripoli Co. v. Wella Corp., 425 F.2d 932, 936 (3d Cir.) (*en banc*), cert. denied, 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 62 (1970).

Whatever may be the extent of the rule announced in *Schwinn*,[26] it is clear

---

25. Citing certain testimony of defendant Sparks at the damage trial, plaintiffs requested at the end of that phase of the trial that the Court reconsider its ruling on the second cause of action which had been announced orally at the close of the liability phase. Sparks testified that he felt that in order to remain competitive with other media it was "highly advantageous" to exercise as much control over the subscription price of the newspaper as the law would permit and therefore he would have responded in the same way to a price increase by the *Daily Review* dealers as he had to counsel's letter of May 14, 1973. (April 25, 1974 (Morning Session), Tr., pp. 202–204.) This testimony, however, was in response to a hypothetical question on cross examination and does not, therefore, constitute probative evidence of Sparks' actual intent in the specific circum-

stances of this case. Moreover, Sparks has repeatedly stated that he would act in any circumstances only to the extent permitted by law. Finally, at all relevant times Sparks has only acted pursuant to the advice of counsel. Thus the testimony cited by plaintiffs does not alter the Court's finding that Sparks was not motivated by an anticompetitive intent when he changed his distribution system. Consequently plaintiffs' motion was denied.

That motion also requested an express ruling under plaintiffs' first cause of action that the terminations were in furtherance of a contract to fix prices. That question is considered under Section V(B), *infra*.

26. See GTE Sylvania Inc. v. Continental T.V., Inc., 1974 Trade Cas. ¶ 75,072 (9th Cir. 1974).

that the holding in that case was predicated not only on the actual existence of territorial (and customer) restrictions on resale but also on the manufacturer's " 'firm and resolute' " insistence on compliance with those restrictions, that " 'firmness' " being "grounded upon the communicated danger of termination." United States v. Arnold, Schwinn & Co., *supra,* 388 U.S. at 372, 87 S.Ct. at 1862, rev'g 237 F.Supp. 323, 339–342 (N.D.Ill. 1965) ; Colorado Pump & Supply Co. v. Febco, Inc., 472 F.2d 637, 639 (10th Cir.), cert. denied, 411 U.S. 987, 93 S.Ct. 2274, 36 L.Ed.2d 965 (1973) ; Janel Sales Corp. v. Lanvin Parfums, Inc., 396 F.2d 398, 406–407 (2d Cir.), cert. denied, 393 U.S. 938, 89 S.Ct. 303, 21 L.Ed.2d 275 (1968). Plaintiffs' proof here fails to establish either of these factual predicates by a preponderance of the evidence.

The pertinent language in the Dealer's Agreement is by itself ambiguous.[27] It neither clearly establishes mere primary areas of responsibility, *cf.* Plastic Packaging Materials, Inc. v. Dow Chemical Co., 327 F.Supp. 213, 215, 225–226 (E.D. Pa.1971), nor unequivocally creates an exclusive territorial system by explicitly preventing a dealer from selling beyond his designated territory. *Cf.* Bowen v. New York News, Inc., *supra,* 366 F.Supp. at 672 n. 45.

The practice of splitting or dividing territories does not by itself, or in conjunction with the language of the Dealer's Agreement demonstrate that defendants, in fact, required plaintiffs and the other dealers to confine their sales within the specific geographic district delineated in their Dealer's Agreement. The fact that a territory may be altered in size or realigned does not prove that the dealer is thereby prevented from selling beyond the new boundaries. There is no evidence that plaintiffs or any other dealer actually tried to sell in an area outside of his new district after it was "split" and was prevented from doing so by defendants. All dealers affected by such splits, including plaintiffs, voluntarily acquiesced in the changes. No split was used to penalize any dealer nor is there any evidence that any dealers were threatened with termination if they did not restrict sales to their own route.[28] In no case was the split implemented without the consent and agreement of the dealer, and whenever a split resulted in a loss of circulation, the dealer's rate was adjusted to avoid any loss of income to the dealer. Following splits of their districts, plaintiffs Beaty and Benham actually experienced an increase in circulation without any adverse adjustment in their rates. Plaintiff Knutson's district was realigned in November, 1970 following dramatic growth of circulation caused by a large volume of office-generated start orders. Shortly after this realignment Knutson's proposed adjustment to his rate was accepted by the management at *The Argus.* Other splits were effected to eliminate service problems and to make distribution more efficient as was the case when the distribution of the *Fremont News-Register* was assimilated into that of *The Argus* in June 1972. Consequently, the infrequent practice of splitting districts does not establish that defendants imposed and enforced territorial restrictions on resales.

Finally, plaintiffs point to the dual wholesale rate as evidence that defendants imposed and enforced territorial restraints on plaintiffs' newspaper sales. Under the Dealer's Agreement defendants agreed to sell newspapers to the

---

**27.** "That the Company will sell to the Dealer such quantities of [the newspaper] as he shall order, at the mutually agreed upon rate of _____ cents per subscribers [sic], per month, up to and including _____ subscribers and all subscribers over _____ at _____ cents per subscriber, to supply the needs of his territory on route known as _____.

"That said rate and territory or route shall be subject to renegotiation upon the giving of ten days notice by either party to the other."

**28.** See Cleland testimony, November 14–15, 1973, Tr., pp. 310–312.

dealer at a certain rate per subscriber up to a fixed number of subscribers and then at a higher rate for each subscriber over the base number. Plaintiffs contend that such a pricing system in effect penalized them for expanding their circulation by raising the costs of servicing added subscribers, particularly for extra subscribers obtained outside their own territory where delivery costs might also be higher. Allegedly this system effectively discouraged plaintiffs and all other dealers from attempting to sell beyond the territory assigned them by defendants. In the absence of any corroborating evidence, this contention is insufficient to establish either the existence of territorial restraints on sales or the "firm and resolute" enforcement of such restraints by defendants. Apart from a few isolated instances of rack sales in other dealers' areas there is no evidence that plaintiffs or any dealers attempted to sell outside their territory either before or after September 1, 1973. Had they attempted such sales and had defendants then insisted that they discontinue these sales, clearly threatened them with termination, or actually terminated their contracts, plaintiffs' proof of unlawful territorial restraints would be far stronger. *Cf.* Beverage Distributors, Inc. v. Olympia Brewing Co., 440 F.2d 21, 30–31 (9th Cir.), cert. denied, 403 U.S. 906, 91 S.Ct. 2209, 29 L.Ed.2d 682 (1971); United States v. Arnold, Schwinn & Co., *supra,* 388 U.S. at 372, 87 S.Ct. 1856, 18 L.Ed. 2d 1249; Plastic Packaging Materials, Inc. v. Dow Chemical Co., *supra,* 327 F.Supp. at 226. On the basis of this record, however, plaintiffs have failed to satisfy their burden of proving that defendants imposed and made efforts to enforce unlawful territorial restraints on plaintiffs' newspaper sales.[28A]

This is not to say that geography played no part in defendants' distribution system. Each dealer was clearly assigned a specific district which had geographic boundaries, and defendants encouraged the dealers to concentrate their efforts within those areas. The evidence does not show, on the other hand, that defendants actually prevented any dealer from soliciting subscriptions and delivering newspapers outside of the designated district. Moreover, the evidence presented herein does not establish that the territorial aspects of the distribution system were "ancillary" to the vertical price fixing discussed above, White Motor Co. v. United States, 372 U.S. 253, 260, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963), or that vertical price fixing was such an "integral part of the whole distribution system", United States v. Bausch & Lomb Co., *supra,* 321 U.S. at 720, 64 S.Ct. at 812, that every aspect of that system, including the assignment of districts, is tainted by the presumptive anticompetitive effects of price fixing. United States v. Arnold, Schwinn & Co., *supra,* 388 U.S. at 375–376, 87 S.Ct. 1856. Consequently, plaintiffs are entitled to no relief on the basis of their third claim.

### D. *Attempt and Conspiracy to Monopolize*

Plaintiffs' final claim for relief alleges that commencing sometime prior to 1970 defendants attempted and conspired to monopolize the publication of community or suburban daily newspapers in the southern Alameda County area in violation of § 2 of the Sherman Act, 15 U.S.C. § 2. Plaintiffs contend that the follow-

---

**28A.** The Court is aware that such a dual wholesale rate structure could possibly be used to impose territorial restraints in violation of § 1 of the Sherman Act. It is the conclusion of the Court that in view of all the circumstances of the instant case and the economic realities of the distribution systems in question, the dual rate structure here was not susceptible of such abusive utilization. There was no evidence that the number of papers available to any of the dealers at the lower rate precluded them from attempting to distribute newspapers outside of their area of primary responsibility. Furthermore, the parameters of the dual rates (*i. e.,* the number of papers available at the lower rate) were subject to upward renegotiation under the terms of the Dealer's Agreement. There was no evidence of any denial by defendants of a dealer's request for a renegotiation of the rate structure due to a desire to expand sales outside of their primary territory.

ing specific acts constitute sufficient evidence of this violation: (1) defendants' practice of fixing subscription prices and imposing territorial restrictions on resale; (2) the exclusion of competition brought about by the long history of defendants' acquisitions of competitors and by the termination of the independent dealer system; and (3) the fraud allegedly perpetrated by defendants on the Audit Bureau of Circulations and, in turn, upon advertisers by phony orders and "add-on" contests. Defendants not only attack the sufficiency of plaintiffs' proof but also move to dismiss the fourth claim on the ground that, even if the allegations therein were true, these plaintiffs lack standing to sue.

Turning first to the issue of standing, the Court finds that on the basis of the well-pleaded allegations in this case, which are assumed to be true for the purposes of the motion to dismiss under Rule 12(b)(6), Fed.R.Civ.P., Brown v. Brown, 368 F.2d 992, 993 (9th Cir.), cert. denied, 385 U.S. 868, 87 S.Ct. 133, 17 L.Ed.2d 95 (1966); 2A J. Moore, Federal Practice ¶ 12.08, plaintiffs have standing to sue for the alleged violation of § 2.[29]

 Defendants' challenge to plaintiffs' standing focuses on the damage claim based on § 4 of the Clayton Act, 15 U.S.C. § 15.[30] In order to establish standing under that section plaintiffs must first allege injury to their "business or property" and second that this injury occurred "by reason of" an antitrust violation. There is no question that plaintiffs' dealerships are commercial ventures. The question remains, however, whether those commercial ventures were injured "by reason of" an antitrust violation, that is, were they within the "target area" of the alleged violation:

"[A] plaintiff has standing under section 4 of the Clayton Act if the claimed losses fall 'within that area of the economy which is endangered by a breakdown of competitive conditions in a particular industry.'" In re Multidistrict Vehicle Air Pollution M.D.L. No. 31, 481 F.2d 122, 129 (9 Cir.), cert. denied, Morgan v. Automobile Manufacturers Assn., Inc., 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973), rehearing denied, 414 U.S. 1148, 94 S.Ct. 905, 39 L.Ed.2d 704 (1974).

This "target area" test for standing is a "two-step approach [which] first requires identification of the affected area of the economy and then the ascertainment of whether the claimed injury occurred within that area." Id. at 129. In the *Vehicle Air Pollution* case the court found that the allegedly "affected" or "endangered" area of the economy was that concerned with the research, development, manufacture, installation, and patenting of vehicle air pollution control equipment, clearly an area in which plaintiff crop farmers had no commercial interest. Therefore those plaintiffs lacked standing under § 4. Id. at 129.[31]

 Here plaintiffs have alleged an attempt to monopolize publication of community or suburban daily newspapers in a specified geographic area, and they allege that as an integral part of that attempt to monopolize defendants fixed resale prices, imposed territorial restraints on dealer distribution, and ter-

---

**29.** For a very comprehensive and provocative analysis of the entire question of standing see Albert, "Standing to Challenge Administrative Action: An Inadequate Surrogate for Claim for Relief," 83 Yale L.J. 425 (1974).

**30.** Given the broader scope of § 16 of the Clayton Act, 15 U.S.C. § 26, In re Multidistrict Vehicle Air Pollution M.D.L. No. 31, 481 F.2d 122, 130 (9th Cir.), cert. denied, Morgan v. Automobile Manufacturers Assn., Inc., 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d

336 (1973), rehearing denied, 414 U.S. 1148, 94 S.Ct. 905, 39 L.Ed.2d 704 (1974), there is apparently no real doubt about plaintiffs' standing to seek injunctive relief under that section.

**31.** The various governmental plaintiffs were also held to lack standing under § 4 because, *inter alia*, their claims alleged no injury to commercial ventures or enterprises. In re Multidistrict Vehicle Air Pollution M.D.L. No. 31, *supra* at 126.

minated all independent home-delivery dealers. These averments indicate that the area of the economy against which the anticompetitive conduct was allegedly directed, i. e., the "endangered" area, includes both the publication and distribution of these community daily newspapers. Plaintiffs' dealerships clearly fall within that "target area". On the basis of their allegations plaintiffs' injury is a "necessary consequence" of acts—price fixing, division of territories, and terminations of dealers—"intended to further the economic concentration [allegedly] sought by defendants, which *must* occur to achieve that end." Contreras v. Grower Shipper Vegetable Assn., 1971 Trade Cas. ¶ 73,592, p. 90,453 (N.D.Cal.1971) (emphasis in original), aff'd, 484 F.2d 1346 (9th Cir. 1973), cert. denied, 415 U.S. 932, 94 S.Ct. 1445, 39 L.Ed.2d 490 (1974). As a result plaintiffs here have standing to sue for the alleged violation of § 2.

▮ With respect to the § 2 violation itself, defendants contend that the evidence fails to establish either a specific intent to monopolize or a dangerous probability of success based upon a showing of market power, both of which are, they argue, necessary elements of an attempt to monopolize claim. Plaintiffs argue that only the specific intent to monopolize need be shown and that the evidence in this case establishes such an intent.

The position of the Court of Appeals for this circuit on the elements of proof required to establish an attempt to monopolize claim has been set forth in a number of recent cases. See Hallmark Industry v. Reynolds Metals Co., 489 F.2d 8, 11–13 (9th Cir. 1973), petition for cert. filed, 417 U.S. 932, 94 S.Ct. 2643, 41 L.Ed.2d 235 (1974) ; Moore v. Jas. H. Matthews & Co., 473 F.2d 328, 332 (9th Cir. 1973) ; Bushie v. Stenocord Corp., *supra,* 460 F.2d at 121; Cornwell Quality Tools Co. v. C.T.S. Co., 446 F.2d 825, 832 (9th Cir. 1971), cert. denied, 404 U.S. 1049, 92 S.Ct. 715, 30 L.Ed.2d 740 (1972) ; Industrial Bldg. Materials, Inc. v. Interchemical Corp., *supra* 437 F.2d at 1344; Lessig v. Tidewater Oil Co., 327 F.2d 459, 474–475 (9th Cir.), cert. denied, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964). In a recent decision this Court reviewed these cases and concluded:

> "The requirement in this Circuit, therefore, is that something more than specific intent is required to establish an attempt to monopolize. Either a dangerous probability of success must be demonstrated, by a showing of market power *or* other evidence, or the claim of an attempt to monopolize must in turn be based upon a substantial claim of restraint of trade. *Cf.* Dobbins v. Kawasaki Motors Corporation, U.S.A., 362 F.Supp. 54, 58–60 (D.Or.1973)." Jack Winter, Inc. v. Koratron Co., 375 F.Supp. 1, 70 (N.D. Cal.1974) (emphasis in original).

At the very least it is clear that in order to establish liability for an attempt and conspiracy [32] to monopolize, plaintiffs must prove that defendants possessed "a specific intent to acquire unlawful monopoly power." Chisholm Brothers Farm Equipment Co. v. International Harvester Co., *supra* 498 F.2d at p. 1144; Times-Picayune v. United States, 345 U.S. 594, 626, 73 S.Ct. 872, 97 L.Ed. 1277 (1953). See also Jack Winter, Inc. v. Koratron Co., *supra,* 375 F.Supp. at 70–

---

32. This showing of specific intent is also an essential part of a claim of conspiracy to monopolize under § 2. Chisholm Brothers Farm Equipment Co. v. International Harvester Co., *supra,* 498 F.2d at p. 1144; Woods Exploration & Pro. Co. v. Aluminum Co. of America, 438 F.2d 1286, 1304 (5th Cir. 1971), cert. denied, 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972) ; Lessig v. Tidewater Oil Co., *supra,* 327 F.2d at 474–475; United States v. Consolidated Laundries Corp., 291 F.2d 563, 573 (2d Cir. 1961) ; United States v. Chas. Pfizer & Co., 367 F.Supp. 91, 99 (S.D.N.Y.1973) ; Bowl America Inc. v. Fair Lanes, Inc., 299 F.Supp. 1080, 1093 (D.Md. 1969) ; United States v. Jerrold Electronics Corp., 187 F.Supp. 545, 567 (E.D. Pa.1960), aff'd, 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806, rehearing denied, 365 U.S. 890, 81 S.Ct. 1026, 6 L.Ed.2d 200 (1961).

71. As in the field of criminal law, this specific intent goes beyond the mere intent to do the act. United States v. Aluminum Co. of America, 148 F.2d 416, 432 (2d Cir. 1945). Plaintiffs must prove a "subjective intent to gain an illegal degree of market control." American Football League v. National Football League, 323 F.2d 124, 132 n. 18 (4th Cir. 1963). Since the intended result of such an attempted monopolization must be the elimination of one's competitors, the acts from which one can infer this specific intent are essentially predatory in nature. "Neither rough competition nor unethical business conduct is sufficient. The requisite intent must be present and predominant." Bowl America Inc. v. Fair Lanes Inc., *supra*, 299 F.Supp. at 1093; American Football League v. National Football League, 205 F.Supp. 60, 65 (D.Md.1962), *aff'd*, 323 F.2d 124 (4th Cir. 1963). Even if a court finds that defendant's practices were not shown to be reasonable at all times, it need not conclude that defendant specifically intended to drive competitors from the field and achieve a monopoly. United States v. Jerrold Electronics Corp., 187 F.Supp. 545, 567 (E.D. Pa.1960), aff'd, 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806, *rehearing denied*, 365 U.S. 890, 81 S.Ct. 1026, 6 L.Ed.2d 200 (1961).

The evidence adduced in this case fails to establish the requisite specific intent to monopolize on the part of any of the defendants. As this Court has found, defendants did engage in resale price fixing in contravention of the *per se* rules judicially imposed under § 1 of the Sherman Act. There is no indication in the evidence as a whole, however, of predatory or knowingly unlawful activity in connection with defendants' effort to establish, by contract, the subscription price of their newspapers. Such a technical violation of § 1 does not provide the basis for a finding of specific intent to destroy competition or build monopoly, particularly in view of the fact that defendants here took prompt action to bring their distribution practices into compliance with the antitrust laws after having been informed by plaintiffs' counsel that these practices were unlawful.

Plaintiffs contend that the requisite specific intent to monopolize can also be inferred from the long history of newspaper acquisitions by Sparks and the defendant corporations, the elimination of independent dealers, and other efforts to exclude potential competitors, such as *The Friday Observer*. In March, 1944 Sparks and two other individuals purchased *The Hayward Daily Review*. In December of that year Sparks bought out his two partners. In 1945 Sparks purchased the *San Lorenzo Sun-Journal* which was then a paid weekly, home delivered in the San Lorenzo area. In the 1950's he acquired the *Castro Valley Reporter*, a paid weekly, home delivered in Castro Valley. Subsequently both of the acquired papers became weekly local inserts in *The Daily Review*. Each insert now has a circulation of approximately 2,000. In 1962 DRI, which was organized by Sparks in 1953 to publish his newspapers, acquired *The Argus* which at that time was a home delivered weekly in Fremont and Newark. DRI acquired the stock of BAPCO in June, 1965, thereby obtaining control of the *Livermore Herald & News* which was then home delivered three times per week primarily in Livermore, and in 1970 BAPCO acquired the weekly *Village Pioneer* which served San Ramon and Dublin. On September 1, 1973, the names of these two newspapers were changed. The *Livermore Herald & News* is now distributed daily as the *Tri-Valley Herald*, and the *Village Pioneer* is now the *Tri-Valley News*. At the time of each of these acquisitions *The Daily Review* also served the areas in which the acquired newspapers circulated.

The final acquisition to which plaintiffs refer occurred in April, 1972, when DRI acquired *The Fremont News Register* and the *San Leandro Morning News* from News Observer, Inc. *The Fremont News Register* was a six-day per week

morning paper delivered in Fremont, Newark and Union City; its distribution has subsequently been merged into that of *The Argus*. The *San Leandro Morning News* was a six day per week morning paper delivered in San Leandro, Castro Valley, San Lorenzo, and Hayward. Following the acquisition DRI provided free blanket distribution of *The Daily Review* in the area of circulation of the *San Leandro Morning News*, thereby increasing the circulation of *The Daily Review* by approximately 2,000. The areas covered by the two acquired newspapers were also served at the time of the purchase by *The Daily Review*, the *San Francisco Chronicle*, and the *Oakland Tribune* and, in the case of *The Fremont News Register* only, by *The Argus*, the *San Jose Mercury*, and the *San Jose News*. In connection with this purchase DRI also acquired three weekly free newspapers (throw-aways), the *Hayward Journal*, the *East Oakland Advertiser*, and the *San Leandro Morning News Advertiser*. The circulation of these three papers largely overlapped with that of *The Daily Review Shopping News*, and DRI thereafter discontinued the publication of these acquired free shoppers. As part of the acquisition from News Observer, Inc., DRI also obtained from the seller corporation and its stockholders, Abraham Kofman, Morton Kofman and Kenneth Kofman, a covenant not to compete which provided that for a period of ten years they would not engage in the newspaper, shopping news, free advertising distribution or other publication business in the City of Oakland and southern Alameda County.

■ The Court finds that these acquisitions alone are insufficient proof from which to infer a specific intent to monopolize. The parties have stipulated that the April, 1972 acquisition was made because Sparks considered it a good business investment because the added circulation would enable him to reduce his per unit costs by taking advantage of economies of scale, to in-crease his advertising rates, and to obtain new accounts. Nothing in the record suggests that any of the other acquisitions were made for reasons other than such honest business purposes. The covenant not to compete obtained from the Kofmans has not been shown to be unreasonable or unrelated to the legitimate goal of protecting one's investment in an acquired business. Specific intent must be shown by stronger proof than this.

The independent dealership system was eliminated in order to comply with the antitrust laws, not for the purpose of excluding competitive newspapers by eliminating potential distributors. That legitimate purpose is clear from Sparks' testimony and is corroborated by plaintiffs' failure to show either that any of the *Argus* or *Daily Review* dealers were anxious or even willing to distribute other newspapers or that the start-up costs of a dealership are so great that other newspapers are precluded from organizing their own distribution systems.

■ Nor do DRI's actions with respect to *The Friday Observer* support a finding of a specific intent to monopolize. In June, 1972, legal counsel for DRI notified *The Friday Observer* that legal action would be taken if it continued to use the name "Observer". No such action has ever been filed even though *The Friday Observer* continues to use that name. In 1973 DRI successfully opposed the petition of *The Friday Observer*, filed in the Alameda County Superior Court, to carry legal advertising originating with the city of San Leandro and the County of Alameda. Defendants have the right to petition all branches of government, including the courts, "to advocate their causes and points of view respecting resolution of their business and economic interests *vis-a-vis* their competitors" so long as that advocacy is not " 'a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor * * *.' " California Trans-

port v. Trucking Unlimited, 404 U.S. 508, 511, 92 S.Ct. 609, 612, 30 L.Ed.2d 642 (1972). Plaintiffs have not shown, however, that in taking what legal action they did with respect to *The Friday Observer*, defendants "sought to bar their competitors from meaningful access to adjudicatory tribunals and so to usurp that decisionmaking process" or that defendants' actions form a "pattern of baseless, repetitive claims * * *" thereby barring competitors from meaningful access to the courts. *Id.* at 512, 513, 92 S.Ct. 609. In the absence of such a showing, this Court cannot infer an unlawful specific intent to monopolize from defendants' exercise of their right to petition their government.

Finally, plaintiffs contend that a specific intent to monopolize can be inferred from defendants' alleged plan to defraud the Audit Bureau of Circulations ("ABC"), and ultimately the advertisers who rely on that organization, by means of "add-on" contests and phony start orders. The ABC is a nonprofit corporation which has among its members a variety of publications, local and national advertisers and advertising agencies. *The Argus, The Daily Review,* the *Herald,* and the *News* are newspaper members of the ABC. The ABC issues standardized statements of the circulation of its publisher members, verifies the figures shown in these statements by auditors' examination of appropriate records, and disseminates circulation data for the benefit of advertisers, advertising agencies, and publishers, all of whom rely on this data for the sale and purchase of advertising space. This data is contained in a semi-annual, unaudited "Publisher's Statement" in which the publisher certifies the facts and figures pertaining to the quantity, quality, distribution and circulation methods of his publications, and in an annual "Audit Report" in which these facts and figures are audited and verified by the ABC. One important figure in both of these statements is the publication's total average paid circulation

which is the number of copies of the publication which have been paid for by purchasers not for resale and at a price not less than fifty percent of the basic single copy price or, in the case of a subscription, the basic subscription price.

Periodically, DRI sponsored a promotional contest wherein participating dealers purchased additional copies of *The Argus* and *The Daily Review* for specified periods of time. The daily draw reports and billing statements rendered to the dealers reflected these purchases of *The Argus* and *The Daily Review*. DRI rewarded the participating dealers with a trip to Lake Tahoe or Las Vegas and/or cash in varying amounts depending upon the number of papers "added-on" and the length of time of the "add-on". The increase in purchases of *The Argus* and *The Daily Review* newspapers resulting from the add-on contests was reflected as paid circulation of *The Argus* and *The Daily Review* newspapers in the Publisher's Statements and in Audit Reports issued by the ABC to advertisers, advertising agencies, and publishers. These promotional contests generally occurred during the month when the ABC made its one weekday and one Sunday determination of circulation. These promotional contests resulted in the *Daily Review* and *Argus* dealers increasing their draws at the outset of the contests and then attempting to work off the increased number of papers by obtaining new subscribers. The effect of these promotional contests was that the dealers purchased newspapers which did not represent paid circulation and which temporarily inflated the paid circulation of *The Daily Review* and *The Argus* on the ABC audit reports and six-month Publisher's Statements. The cash contest prizes awarded pursuant to these promotional contests were paid by check from DRI to the dealers and were not reflected on the dealer's monthly statement as credits. The ABC auditors were provided by DRI with the dealers'

monthly statements as well as the number of subscribers obtained by the use of premiums, reduced prices, insurance, and charity promotion sales efforts. The ABC auditors were not advised of the add-on contests.

This evidence does not prove that these contests were intended as anything other than a legitimate promotional device by means of which defendants attempted to obtain actual new subscribers through increased efforts by the dealers and to promote good will among the dealers. The contests were engaged in voluntarily by the dealers without coercion, and many dealers refrained from participating. The evidence with respect to these "add-on" contests does not warrant a finding that defendants sought to distort circulation figures in order to defraud the ABC and advertisers, and no specific intent to monopolize can be inferred from the use of these contests.

The charge that defendants encouraged and paid for phony start orders, if proved, would be more convincing evidence of a specific intent to monopolize since it is unlikely that such a tactic could have a purpose other than distortion of the circulation figures on which advertisers rely when choosing between competing newspapers. The scheme was purportedly initiated by John Clark, assistant circulation manager of *The Daily Review* and promotion manager of all of defendants' newspapers. Plaintiff Berthiaume testified [33] that in April, 1971 he was approached by Clark who asked him to write dummy start orders, using certain code initials, for former subscribers who had stopped taking the paper and had not actually requested a resumption of service. These orders were to be turned in to Clark who agreed to pay one dollar for each dummy order which was not killed, *i. e.*, found by the newspaper to be no good (NG). The code initials were used so that some of these orders would not actually be verified in order to maintain the usual rate of NG's generally experienced among all start orders and to prevent the orders from being passed along to the carriers. Berthiaume testified that he wrote such phony orders not only for old subscribers but also using a street directory and phone book to obtain names and addresses of new subscribers for the dummy orders, and he turned them in to Clark periodically and received payment for them. Plaintiffs also alleged that the professional, or "outside", solicitors employed by DRI, such as Felder and Bernie Hoye, also participated in this plan. There is absolutely no evidence in the record, however, which links this scheme to Sparks, and only one remotely possible reference [34] to any other individual defendant, other than Clark. A specific intent to monopolize, *i. e.*, the subjective intent knowingly to create an unlawful monopoly, on the part of Sparks, Cleland or the defendant corporations cannot be inferred from the existence of a plan concocted by a single individual within DRI when neither publisher and owner Sparks nor circulation director Cleland had any knowledge of nor participated in such a scheme.

None of the specific acts on which plaintiffs rely as proof of specific intent to monopolize either singly or cumulatively warrants a finding of such an intent on the basis of the entire record in this case, and having failed to prove by a preponderence of the evidence that defendants collectively or any of them individually harbored that requisite specific intent to monopolize, plain-

33. Plaintiffs' evidence as to these phony orders is based largely on Berthiaume's testimony. See Berthiaume testimony December 1, 1973, Tr., pp. 33 et seq.

34. The separate notations "Payoff", "Hayward Payoff", and "Dallis" in the check stub records of Hoye & Associates is clearly insufficient to prove that Dallas Cleland had any involvement in or knowledge of the phony order plan.

tiffs' claim of attempt and conspiracy to monopolize the publication of daily community newspapers in the southern Alameda County area fails.

Plaintiffs have, therefore, established defendants' liability only for contracting to fix the subscription prices of their newspapers in violation of § 1 of the Sherman Act. Plaintiffs have failed to prove that the termination and transfer provisions of the Dealer's Agreement or the actual termination of all independent home delivery dealers was pursuant to a contract, combination or conspiracy in unreasonable restraint of trade, that defendants imposed unlawful territorial restrictions on the resale of their newspapers, or that defendants attempted or conspired to monopolize the publication of community daily newspapers in the southern Alameda County area.

## V. THE DAMAGE ISSUE

Plaintiffs' damage claims are twofold. First, they claim that in the absence of the resale price ceiling imposed by defendants, plaintiffs would have realized higher profits by selling their newspapers to the carriers at higher prices.[35] Second, they allege that their independent dealerships had a going concern value which was lost when defendants terminated the dealership agreements in response to the charges of antitrust violations.

■ While the price maintenance provision of defendants' Dealer's Agreement has been found to have violated

§ 1 of the Sherman Act, it has been repeatedly held that the mere existence of an antitrust violation is not sufficient by itself to support private recovery under Clayton Act § 4, 15 U.S.C. § 15.[36] " '[T]he gist of the action is legal injury—not mere violation of the statute. The damage for which recovery may be had in a civil action must be proximately related to the conspiracy; recovery for a statutory violation is not based on the conspiracy itself but on injury to the plaintiff produced by specific overt acts pursuant to the conspiracy.' " Winckler & Smith Citrus Products Co. v. Sunkist Growers, Inc., 346 F.2d 1012, 1014 n. 1 (9th Cir.), cert. denied, 382 U.S. 958 86 S.Ct. 433, 15 L.Ed.2d 362 (1965); Gray v. Shell Oil Co., 469 F.2d 742, 749 (9th Cir. 1972), cert. denied, 412 U.S. 943, 93 S.Ct. 2773, 37 L.Ed.2d 403 (1973). "By its own terms, Clayton Act recovery is available only where actual injury has been suffered." Siegel v. Chicken Delight, Inc., 448 F.2d 43, 52 (9th Cir. 1971), cert. denied, 405 U.S. 955, 92 S.Ct 1172, 31 L.Ed.2d 232 (1972).

■ It has also been clear in this Circuit since the landmark case of Flintkote Co. v. Lysfjord, 246 F.2d 368 (9th Cir.), cert. denied, 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957), that in order to establish the requisite "actual" or "legal" injury—the fact of damage —"the plaintiff is required to establish with reasonable probability the existence of some causal connection between defendant's wrongful act and some loss of anticipated revenue." *Ibid.* at 392.[37]

---

35. The resale price restriction here differs from the normal situation in that it is one level further down the distribution chain. The actual price which was fixed by the Dealer's Agreement prior to September 1, 1973, was the price at which the newspapers were sold to the public. However, since the publisher also suggested a margin to be paid the carriers, the dealers were effectively restricted because of economic realities as to the price they could charge their carriers.

36. 15 U.S.C. § 15 provides:

"Any person who shall be injured in his business or property by reason of anything

forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

37. This standard of proof of the fact of damage has also been held to require proof to a "reasonable certainty" of the causal connection between damages alleged and the violation. Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co., 284 F.2d 1, 32

Only then will the fact finder be permitted to " 'make a just and reasonable estimate of the damage' " under the more lenient standards announced in Bigelow v. RKO Radio Pictures, 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652 (1946). *Flintkote* makes this dichotomy very clear:

> "The cases have drawn a distinction between the quantum of proof necessary to show the *fact* as distinguished from the *amount* of damage; the burden as to the former is the more stringent one. In other words, the *fact* of injury must first be shown [as a "reasonable probability"] before the jury is allowed to estimate the *amount* of damage." Flintkote Co. v. Lysfjord, *supra* at 392 (emphasis in original). See also Story Parchment Co. v. Paterson Co., 282 U.S. 555, 562, 51 S.Ct. 248, 75 L.Ed. 544 (1931) [38]

Applying this requirement that plaintiffs must prove the *fact* of damage, *i. e.*, an actual loss caused by the defendants' wrongful conduct, courts in this Circuit have rejected plaintiffs' damage claims both where there has been insufficient evidence of "actual injury", Gray v. Shell Oil Co., *supra;* Siegel v. Chicken Delight, Inc., *supra;* Flintkote Co. v. Lysfjord, *supra;* Wolfe v. National Lead Co., 225 F.2d 427, 429–432 (9th Cir.), cert. denied, 350 U.S. 915, 76 S.Ct. 198, 100 L.Ed. 802 (1955); Peter v.

Union Oil Co., 328 F.Supp. 998, 1002–1003 (C.D.Cal.1971), and where there is inadequate proof that some actual loss was proximately caused by defendants' violation, Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co., *supra,* 284 F.2d at 32–33; Talon, Inc. v. Union Slide Fastener Inc., 266 F. 2d 731, 736–738 (9th Cir. 1959). (It also appears that in this case the court was not convinced that there was sufficient proof of an actual loss of profits.); E. V. Prentice Mach. Co. v. Associated Plywood Mills, 252 F.2d 473, 477–479 (9th Cir.), cert. denied, 356 U.S. 951, 78 S.Ct. 917, 2 L.Ed.2d 844 (1958).

### A. *Lost Profits*

Plaintiff's proof of lost profits is based on a "before/after" test in which the "before" or the "damage" period is the time during which plaintiffs were prevented from raising their prices,[39] and the "after" period is the time since September 1, 1973 when plaintiffs have been unrestrained in their price decisions. At various times during this "after" period all of the *Daily Review* dealer plaintiffs and two of the *Argus* dealer plaintiffs have, in fact, raised the price at which they sell to the carriers and have suggested that the carriers charge higher subscription prices; and all testified that they are now experiencing higher net profits despite the loss in circulation resulting from

---

(9th Cir. 1960), rev'd on other grounds, 370 U.S. 19, 82 S.Ct. 1130, 8 L.Ed.2d 305 (1962).

**38.** This distinction between the fact and the amount of damage and the rule that a lesser degree of proof is permitted only for the latter are also well established in general tort law.

**39.** The damage period claimed by the *Daily Review* dealer plaintiffs is generally from September 1, 1969, to August 31, 1973, although three of these seven plaintiffs claim lost profits during a shorter period beginning on February 1, 1970 (Berthiaume), December 1, 1972 (Nyland), and February 1, 1973 (Williams). The claimed damage period for the *Argus* dealer plaintiffs end on February 28,

1973, since on March 1, 1973, *The Argus* went up to $3.00 a month, *i. e.*, 25 cents above the price then charged for *The Daily Review*. These plaintiffs claim that their damage period commenced on September 1, 1969 (Beaty, Knutson and Dan Dutra) and November 1, 1970 (Benham). Plaintiff Laura Duarte declined to take the stand and testify concerning her loss of profits and Plaintiffs' Proposed Findings of Fact and Conclusions of Law Re Impact and Damages make no mention of the damage period or the amount of lost profits claimed by Mrs. Duarte. She has apparently waived any claim for lost profits due to the price restraint.

the price increases.[40] Many of the plaintiffs also testified that they would have raised their prices at the earliest opportunity during the "damage" or "before" period if there had been no restraint on price by defendants. Based on the increased profits allegedly realized in the "after" period and this testimony about their price-raising intent, plaintiffs contend that they have established the *fact* of damage—namely, that but for the price ceiling imposed by defendants during the "before" period, plaintiffs would have made higher profits based upon the higher prices they would have charged. Moreover, by application as constant figures of the profit increases and circulation losses of the "after" period to the whole of the damage period, plaintiffs arrive at an estimate of the *amount* of damage suffered ranging from a low of $1,836 for plaintiff Ely to a high of $36,040 for plaintiff Jackson.

40.

| Dealer | Date of Increase | Amount of Suggested Subscription Price Increase | Alleged Increase in Average Net Profit/ Subscriber/ Month | Average Net Profit/ Subscriber/ Month Jan–Aug '73 | Alleged Circulation Loss (%) | |
|---|---|---|---|---|---|---|
| | | | | | By Pltfs. | By Defs. |
| Berthiaume | 9/1/73 | 50¢ | 49¢ | 41¢ | 19.1 | 17.15 |
| R. Dutra | 11/1/73 | 60¢ | 37¢ | 36¢ | 5.1 | 14.12 |
| Williams | 10/1/73 | 60¢ | 51¢ | 41¢ | 10.5 | 13.61 |
| Jackson | 11/1/73 | 50¢ | 39¢ | 44¢ | 2.6 | 13.86 |
| Nyland | 10/1/73 | 60¢ | 44¢ | 28¢ | 23.8 | 18.81 |
| Kittredge | 10/1/73 | 50¢ | 43¢ | 52¢ | 12.8 | 12.41 |
| Ely | 11/1/73 | 50¢ | 45¢ | 87¢ | 23.9 | 13.5 |

(See Exhibits 198–204A and YYYY)

| Dealer | Date of Increase | Amount of Suggested Subscription Price Increase | Alleged Increase in Average Net Profit/ Subscriber/ Month | Alleged Circulation Loss (%) |
|---|---|---|---|---|
| Beaty | 4/1/74 | 25¢ | 18¢ (projected; equals average wholesale rate increase in Beaty's district on 4/1/74) | 15 (based on average circulation loss of *Daily Review* dealers) |
| Benham | 4/1/74 | 25¢ | 20¢ (projected; equals average wholesale rate increase in Benham's district on 4/1/74) | 15 (based on average circulation loss of *Daily Review* dealers) |

(See Exhibits 205A and 205B)

As to both the fact and amount of damage, the *Argus* dealer plaintiffs, including Beaty and Benham whose price increases occurred too late to create any meaningful "after" period for them, rely on the experience of the *Daily Review* dealers. See Exhibit 205. They contend that the *Daily Review* and *Argus* dealerships are virtually identical, and therefore the *Argus* dealers can establish their injury through the use of the business records of these "comparative but unrestrained enterprises" as permitted in Flintkote Co. v. Lysfjord, *supra*, 246 F.2d at 392. Without reaching this question of comparability, the Court finds that, since it is based on data from the *Daily Review* dealers' damage studies, the *Argus* dealers' damage proof suffers from the same weaknesses of artificiality and doubtful credibility, and therefore does not support their claim for lost profits. It is also interesting to note that the damage estimates for Beaty and Benham based on their April 1, 1974 price increase (Exhibits 205A and 205B) are significantly less than the estimates for those plaintiffs derived from the *Daily Review* dealers' experience (Exhibit 205).

As indicated by the conflicting figures in the above chart, plaintiffs and defendants disagree on the exact percentage loss in circulation that resulted from the *Daily Review* price increases. Given the result reached on the question of the fact of damage, the Court need not resolve this factual issue.

Based on an exhaustive review of the record and for the reasons set out below, however, the Court concludes that plaintiffs' proof of the fact of damage falls short of that clearly required by *Flintkote.* Moreover, since plaintiffs' estimate of the amount of their damages is based on exactly the same facts and theory offered on the question of impact, the inadequacies which the Court finds in that proof require that their damage estimates be rejected as speculative and conjectural. Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., *supra,* 416 F.2d at 85–88; Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co., *supra* 284 F.2d at 34; Flintkote Co. v. Lysfjord, *supra,* 246 F.2d at 393.

■■ The first weakness in plaintiffs' proof on the fact of damage concerns the likelihood that any of the plaintiffs would in fact have raised their prices to their carriers with the result that the subscriber would have paid more than the publisher's "suggested" price during the four-year damage period. Proof that such increases were a reasonable probability is crucial to plaintiffs' damage theory. Because of the "self-evident intangible nature" of proving what might have occurred, the Court clearly cannot require proof to a certainty that such increases would have occurred. Flintkote Co. v. Lysfjord, *supra,* 246 F.2d at 391–392; Zenith Corp. v. Hazeltine, 395 U.S. 100,

123–124, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969). Nor does the Court necessarily require that plaintiffs prove that they actually engaged in the potentially futile act of violating a price-fixing agreement in order to be able to establish fact of damage at a subsequent trial. See Continental Co. v. Union Carbide, 370 U.S. 690, 699–700, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962); Hanover Shoe, Inc. v. United Shoe Machinery Corp., 377 F.2d 776, 780–781 (3d Cir. 1967), aff'd in part 392 U.S. 481, 487 n. 5, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). On the other hand, the fact of damage in a case charging maximum price fixing is not automatic once the violation is established as it might be where plaintiffs have been overcharged by a monopolist or by a conspiracy to fix minimum prices. Gray v. Shell Oil Co., *supra,* 469 F.2d at 750, *distinguishing* Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968).[41] Plaintiffs must initially establish that fact of damage by showing that there was a reasonable probability that such increases would have occurred. *Cf.* Peter v. Union Oil Co., *supra,* 328 F.Supp. at 1003.

■■ The evidence which they presented on this issue, however, amounted to no more than conjectural hindsight and even contained contradictory assertions of interested parties.[42] Such speculative damage evidence has been re-

---

41. It is interesting to note that the District Court in *Hanover Shoe* made a specific finding of fact on an issue analogous to the one considered here. The trial court found that had Hanover been given the opportunity, it would have bought rather than leased defendants' machines thereby avoiding the overcharges. This finding was affirmed by the Court of Appeals and not disturbed by the Supreme Court. Hanover Shoe, Inc. v. United Shoe Machinery, *supra,* 392 U.S. at 484 n. 16, 88 S.Ct. 2224, 20 L.Ed.2d 1231.

42. When questioned on this subject, several of the plaintiffs merely speculated on the fact or amount of these intended price increases:

Robert Dutra:

"Q. [W]hen, prior to September 1, would you have increased your price had you been free to do so? A. Well, that's kind of hard to say. I really don't know." (April 23, 1974, Tr., p. 54.)

Jackson:

"Q. What would you have charged your carrier boys in 1969?

"A. I have no idea. I won't speculate on that.

"Q. You simply say you would have increased your rates but you don't know how much?

"A. Not at this time, four or five years later.

\* \* \* \* \*

"Q. Well, let me ask you this: Are you saying you would not have increased your price in 1969 to your carrier boys?

"A. I am just speculating. I would say if I had the opportunity. I would have.

peatedly criticized by the Court of Appeals for this Circuit. Gray v. Shell Oil Co., *supra*, 469 F.2d at 748–750; Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., *supra*, 416 F.2d at 87. The credibility of the evidence is further diminished by the fact that these claims were first made during the trial and lack any corroborating circumstantial evidence. None of the plaintiffs and no other *Daily Review* or *Argus* dealer ever tried to increase his price prior to September 1, 1973, and with the exception of plaintiff Ely, who later contradicted her original testimony on this question,[43] there is no substantial evidence that any of the plaintiffs ever discussed the subject of dealer price increases with management or with each other during the damage period. Moreover, only two of the *Argus* dealer plaintiffs have actually raised their prices during the "after" period which suggests that competitive pressure from the metropolitan dailies, particularly *The Oakland Tribune*, and even competition between *The Argus* and *The Daily Review* itself actually may have created a market-established price ceiling which would have prevented plaintiffs from raising

"Q. How much?
"A. I don't know—five years ago.

\* \* \* \* \*

"Q. Have you ever planned or proposed an increase in price before September 1, 1973?
"A. No.
"Q. You never did?
"A. No.
"Q. You never talked to anyone at the Review about it, did you?
"A. No."
(April 23, 1974, evening Tr., pp. 26–30.)
Kittredge:
"Q. Now, referring to your statement that you would have charged more to your carriers had you been free to do so, before September of '73, how far back would you have done that?
[Objection deleted]
"THE WITNESS: Since I started as a dealer, and was familiar with the workings of it.
"MR. FINE: All the way back to before 1969?
"A. Yes.
"Q. Why do you state that you would have gone all the way back before 1969?
"A. Well, I can only assume, myself, that I would have done the same thing that I did when I wasn't bound by the price fixing contract."
(April 23, 1974, evening Tr., p. 9.)
Some plaintiffs flatly stated that they never considered raising their prices; nevertheless they claim lost profits for their entire damage period:
Jackson: see *supra*, p. 1380.
Beaty:
"Q. Did you ever, during the time you were a dealer, consider increasing your price?
"A. No."
(April 24, 1974, Tr. p. 83.)
Benham:
"Q. What was the price in 1970?
"A. 2.00 per month.

"Q. Did you really consider going up at all at that time?
"A. Not at that time, no."
(April 23, 1974, Tr., p. 119.)
"Q. Well, assuming that your characterization of the letter of May 14th is accurate— I am not really asking you whether you requested the power or authority to set your own rate, I am asking you if at any time prior to July 25, 1973, you personally considered and proposed an increase in your rate to your subscribers?
"A. That is excluding the letter [of May 14, 1973]?
"Q. Yes.
"A. No."
(Benham deposition, p. 19, adopted at April 23, 1974, Tr., p. 121.)
Plaintiff Williams testified that he was claiming damages from January 1, 1973 although he also testified that February 1, 1973 was the earliest time that he could have raised his prices. (April 22, 1974, Tr., pp. 93–94.) In Plaintiffs' Proposed Findings of Fact, Williams' damage period was changed so that it commenced on February 1, 1973. Plaintiff Knutson testified that he did not believe he would have raised his price prior to March 1, 1973 (February 6, 1974, Tr., pp. 67–71, incorporated in damage trial testimony at April 23, 1974, Tr., p. 98), yet he also claims lost profits for the entire period from September 1, 1969, to February 28, 1973. Finally, like Kittredge, plaintiff Ely claims that she would have raised her price soon after she became a dealer. (April 24, 1974, Tr., pp. 110–111), but the Court finds it highly unlikely that dealers would institute price increases without previous experience or the benefit of several months operating results. As plaintiff Nyland admitted: "You don't start a job on one day and the next day change the price." (April 22, 1974, Tr., p. 21.)

43. April 24, 1974, evening Tr., p. 5.

their prices at all or in the amounts which they now assert would have been their increase.[44] Because of the paucity and doubtful credibility of the evidence on this question, plaintiffs have not satisfied their burden of proof on the first element of the fact of damage, namely, whether there was a reasonable probability that plaintiffs would have raised their prices during the damage period if their price decisions had been unrestrained.

Even if the Court were to accept plaintiffs' testimony, there is a second and more fundamental flaw in plaintiffs' proof of the fact of damage. That proof is based on a "before/after" test derived from Bigelow v. RKO Radio Pictures, *supra*, 327 U.S. at 258, 66 S.Ct. 574. Bigelow used his "before" period—the years preceding the illegal restraint—as a base period for establishing his normal profits in the absence of restraints which he then compared to the actual receipts during the damage or "after" period. Since plaintiffs here have no business history prior to the restraint, their base period must be that period after the restraint was dissolved, and their comparison is of the allegedly normal profits in the "after" period with those realized in the "before" or damage period. While the use of such post-restraint data is not necessarily improper, *see* Rangen, Inc. v. Sterling Nelson & Sons, 351 F.2d 851, 855 (9th Cir. 1965), cert. denied, 383 U.S. 936 86 S.Ct. 1067, 15 L.Ed.2d 853 (1966); Flintkote Co. v. Lysfjord, *supra* 246 F.2d at 392–393, a close analysis of plaintiffs' evidence indicates that the very linchpin of their damage theory is fatally defective.

Plaintiffs' damage theory essentially rests on a single figure—the monthly net profit allegedly realized by each plaintiff during the "after" period— found in their profit and loss statements (Exhibits 109A, 110A, 111, 112A, 113, 114A, 115, 116, 117A, 118, 119 (as modified by 119A), and 120). Using that figure [45] plaintiffs first determine their average monthly net profit per carrier sale during the "after" period from

---

44. Plaintiffs Robert Dutra and Douglas Knutson clearly acknowledged this market-established price ceiling. With respect to *The Daily Review*, Dutra testified:

"Q. During the period to January 1, 1971, would you have increased the price of the Hayward Daily Review to the same price that the Oakland Tribune was selling?

"A. I don't believe it was the Oakland Tribune—I don't know what it was selling.

"Q. Suppose it was selling for three and a quarter and your contract price was 2.75. I think you stated you would have increased by fifty percent [sic] during the damage period, is that right?

"A. Well, I wouldn't have increased to 3.25 or whatever the Tribune was selling at that time, no.

"Q. You would not have, Okay. Why not?

"A. Well, I think you can price yourself out of the market.

"Q. And you feel—

"A. And I felt that the Tribune was more of a metropolitan paper and I didn't want to lose any more circulation than I could help."

(April 23, 1974, Tr., pp. 67–68.)

*Argus* dealer Knutson testified as follows:

"Q. Have you given any consideration since September 1 of '73 to increasing your prices to your carriers?

"A. I have considered it, yes.

"Q. And you have not implemented any change?

"A. I have not.

"Q. And what reasons have you for not making any change in your price to your carriers?

"A. Well the main reason is that The Argus was—has been at $3.00 a month and The Daily Review, which is our main, basically the same paper from Hayward, it's a larger paper than the Argus, approximately twice the size pay-wise [sic], has been selling for $2.75, and I just didn't feel that people would pay more for the Argus than—that much more for the Argus than they would for the Review. They would stop the Argus and take the Daily Review."

(February 6, 1974, Tr., pp. 67–68, incorporated into damage trial testimony at April 23, 1974, Tr., p. 98.)

45. While other data is used in plaintiffs' damage studies, the Court finds that this monthly net profit figure is the variable which most directly affects plaintiffs' computation of their lost profits.

which they derive the increase in average monthly net profit per carrier sale allegedly due to the price increase. In turn that per carrier sale profit increase is used to compute the monthly and, ultimately, the total damage claimed by each plaintiff.[46] However, that central figure in the damage studies—and the unaudited profit and loss statements of their actual operations from which that monthly figure is derived—is in the context of this litigation both inherently suspect and patently artificial. These defects destroy the probative value of the "after" period which is the source of the profit and circulation "market experience" used to show both the fact and amount of damage.[47]

Since plaintiffs' crucial profit and loss data, unlike that in *Bigelow,* was recorded and compiled well after the complaint was filed in the very litigation in which it was to be used to prove actual injury, its credibility is certainly suspect. Plaintiffs clearly had the opportunity to vary their gross income and expense figures during the "after" period in order to exaggerate the favorable impact that price increases might have on profitability. Defendants contend that such distortions actually occurred, but the evidence of intentional exaggeration is somewhat inconclusive. Nevertheless some of plaintiffs' profit data strains the Court's credulity to the breaking point. For example, plaintiff Berthiaume claims to have experienced an increase in his monthly average net profit per carrier sale of $0.49 during the "after" period even though the entire price increase to subscribers was only $0.50 per month, of which he received only $0.40, and even though the price increase resulted in a circulation loss of between 17.15% and 19.1%.[48] This $0.49 figure represents a claimed increase of more than 100% over the $0.41 average monthly net profit per carrier sale for the period of January–August, 1973. Plaintiffs Robert Dutra, Williams, and Nyland also claim increases of over 100%.[49]

Plaintiffs' profit and loss statements were prepared by an accountant, Russell Masters, who was aware of the purpose for their preparation. He prepared as many as four different sets of financial statements for certain of the plaintiffs. Masters admitted that the accuracy and validity of the statements did not depend upon any audit conducted by him since all of the figures were based on the unverified representations and estimates of plaintiffs and whatever documents they produced with respect to expenses and gross receipts. Moreover, when assessing the credibility of these profit and loss statements the Court cannot ignore the fact that the unaudited financial statements originally offered by several of the plaintiffs purportedly reflecting their actual operations indicated significantly higher net profit figures than were reported on those plaintiffs' federal income tax returns for the years in question.[50] With its credibility so

---

46. See *Daily Review* dealer plaintiffs' damage studies, Exhibits 198, 199, 200, 201, 202, 203 and 204, particularly columns g, h and i in Exhibit A, column e in Exhibit D, and column h in Exhibit E in each of these studies. Since the *Argus* dealer plaintiffs derive their estimated damages from those of the *Daily Review* dealers, see Exhibit 205, this monthly net profit figure is equally central to the *Argus* dealers' claims.

47. The Court's concern here is with the reliability of the "after' period itself as a proper source of accurate damage information rather than with the comparability of the "before" and "after" periods which is argued by both parties in their memoranda and in closing arguments.

48. Mechanically, he charged his carriers $.40 more per subscriber and suggested that they in turn resell to home subscribers at an increased price of $.50 per month.

49. See note 40, *supra.*

50. Defendants note such discrepancies, ranging between approximately $1,300 and $4,000, for plaintiffs Benham (Exh. QQQQ), Kittredge (Exh. SSSS), Jackson (Exh. UUUU), and Dan Dutra (Exh. WWWW), and the Court also notes similar differences for plaintiffs Nyland (compare exhibits 114 and 128 marked for identification only) and Robert Dutra (compare exhibits 113 and 184 marked for identification only). The Court refused to admit plaintiffs' profit and loss statements

seriously called into question, the damage proof—both as to fact and amount—based on the claimed profit experience in the "after" period simply does not constitute the "substantial evidence" required to establish injury. Flintkote Co. v. Lysfjord, *supra*, 246 F.2d at 392–393.

Another and equally fundamental weakness in plaintiffs' proof of the fact of damage arises from the artificiality of the "after" period upon which the claims of lost profits are based. Plaintiffs conceded that "[d]amages must be predicated on real market conditions * * *."[51] Yet during the entire "after" period one dominant market factor—the wholesale price charged by the publisher and paid by the dealers—has been under a court-imposed restraint that prevents defendants from raising that price. The wholesale price charged by the publisher has a direct and substantial impact on plaintiffs' net profits. Even before receiving the letter of May 14, 1973, the record is uncontroverted that defendants had planned to raise the monthly wholesale price of *The Daily Review* by approximately $.45 on October 1, 1973. Had that price increase gone into effect, it would have had a significant impact on plaintiffs' profits, total circulation, and on the competitive relationship between defendants' newspapers and the competing metropolitan and other newspapers. The judicial prohibition of the scheduled wholesale price increase is an externality which makes the "after" period an artificial rather than a real market experience thereby destroying the probative value of the "before/after" test relied upon by plaintiffs.

In antitrust cases three types of evidence have been approved as providing a basis for the award of damages. "(1) Business records of the plaintiff or his predecessor before the conspiracy arose. (2) Business records of comparative but unrestrained enterprises during the particular period in question. (3) Expert opinion based on items (1) or (2)." Flintkote Co. v. Lysfjord, *supra* at 392 (footnotes omitted). Plaintiffs' evidence of damage based on their own records has been shown to be insufficient to meet their burden of proof on the fact and the amount of damages, and plaintiffs did not present expert testimony on this issue. Had they chosen the comparative method they would have been equally unsuccessful in their attempt to prove the fact of damage. In connection with their claim for loss of going concern value plaintiffs have vigorously asserted the comparability of the *Daily Review* and *Argus* dealerships involved here with dealerships of *The Sacramento Union*. The Court finds, *infra*, that these dealerships are not comparable, but even if they were assumed to be, the comparative profit figures of these dealerships during the damage period reveal that the restrained plaintiff dealerships were actually more profitable during the damage period than the unrestrained *Sacramento Union* dealerships.[52] For example, plaintiff Beaty testified that the percentage of net profit to gross income of his *Argus* dealership was substantially higher than that of *Sacramento Union* District 700 (which he claimed to be comparable to his dealership) in 1972 and 1973 and that his net income was equal to or

---

into evidence until there was satisfactory proof that the unaudited profit figures claimed by plaintiffs were accurately reflected in amended tax returns filed with the Internal Revenue Service. Plaintiffs' affidavits stating that such amended returns had been filed were filed with this Court on May 23, 1974, June 7, 1974, and July 11, 1974.

51. Plaintiffs' Reply Memorandum on Damages, p. 11.

52. Plaintiffs' explanation for the relative lack of profitability of the *Sacramento Union* dealerships is not supported in the record. They argued that there was a restraint imposed upon the *Sacramento Union* dealers by the publisher but the Court precluded them from attempting to prove contentions not previously raised in the present case. To have ruled otherwise would have required a second substantial trial in an already complex and protracted case.

greater than that of District 700 in both years even though *The Argus* was selling at $0.50 below *The Sacramento Union.* (April 18, 1974, Tr., pp. 360–367.) Daniel Dutra testified that in the year 1973, when the *Argus* advertised subscription rate had increased to $3.00, he had a $0.939 gross profit margin per subscriber while Kay of District 700 had a $0.714 gross profit margin per subscriber when following the suggested rate of $3.00. (April 23, 1974, evening Tr., pp. 44–45.) Similarly plaintiff Kittredge (Exh. 110A) earned a larger net profit during the year of 1972 than was generated in the operation of District 700 which he claimed to be comparable to his dealership (April 18, 1974, Tr., p. 364), and this result occurred even though *The Daily Review* advertised subscription price was $2.75—$0.25 less than that of *The Sacramento Union!*

■ The Court finds that plaintiffs have not shown that there is a reasonable probability that they actually would have increased their prices during the damage period if they had been permitted to do so or that they actually would have realized higher profits had they raised their prices. Consequently, plaintiffs have failed to prove both the fact and amount of damage on their lost profits claim.

#### B. *Loss of Going Concern Value*

Plaintiffs also claim that they were damaged by the loss of the going concern value of their independent dealerships when defendants terminated their dealership contracts effective, but for the intervention of this litigation, September 1, 1973. Plaintiffs allege that these terminations were pursuant to and in furtherance of defendants' resale price fixing plan. They contend that although no *Daily Review* or *Argus* dealerships have actually been sold, the transfer provisions of the Dealer's Agreement create a saleable going concern value roughly equal to that realized in the recent sales of city-zone districts #700 and #800 and the Roseville country-zone district of *The Sacramento Union.*

Plaintiffs here, however, have failed to establish either the requisite causal relationship between violation and alleged injury, or sufficient proof of an actual loss of going concern value, both of which are necessary to demonstrate the legal injury—the fact of damage—required by Flintkote Co. v. Lysfjord, and Winckler & Smith Citrus Products Co. v. Sunkist Growers, Inc.

■ Turning first to the question of proximate cause, plaintiffs correctly point out that once antitrust liability has been established, the issue becomes one of causation and not of the reasonableness of the injury. See Osborn v. Sinclair Refining Co., 324 F.2d 566, 571–572 (4th Cir. 1963). Therefore, the fact that the terminations themselves have not been found to be unreasonable restraints of trade does not preclude the court from finding that the refusals to deal with plaintiffs, inherent in the terminations complained of, were proximately caused by defendants' prohibited price fixing conduct. Once defendants have set in motion an illegal undertaking they will be held accountable for damage caused by any act "pursuant to or in furtherance of the plan" even though the particular act in question may itself be a reasonable business decision. Standard Oil Co. v. Moore, 251 F.2d 188, 211 (9th Cir. 1957), cert. denied, 356 U.S. 975, 78 S.Ct. 1139, 2 L.Ed.2d 1148 (1958). "Legal cause exists between the antitrust wrong and the injury if that wrong is a substantial factor in bringing about the injury. It need not be the sole or the 'controlling' cause of the injury." Mulvey v. Samuel Goldwyn Productions, 433 F.2d 1073, 1075 n. 3 (9th Cir. 1970) cert. denied, 402 U.S. 923, 91 S.Ct. 1377, 28 L.Ed.2d 662 (1971).

■ Rather than being "pursuant to or in furtherance of" defendants' resale price fixing agreement, however, the terminations here were clearly undertaken for the purpose of bringing an end to defendants' antitrust violation by means of a complete change to a new and lawful distribution system. There simply is no evidence of any continuing

violation which these terminations could be said to be "pursuant to or in furtherance of". Defendants' new contracts with carriers contain no mention of resale price, and there is no credible evidence that defendants have coerced the carriers into charging the suggested retail price. Unlike the defendants in Albrecht v. Herald Co., *supra;* Osborn v. Sinclair Refining Co., *supra;* Dahl v. Hearst Corp., *supra;* Bowen v. New York News, Inc., *supra,* defendants here were not using the terminations to enforce an anticompetitive agreement or combination by coercion and punishment of recalcitrant dealers. Had the instant plaintiffs never questioned the lawfulness of the price restrictions in the Dealer's Agreement it is likely that defendants would have continued to use an independent dealer system based on that agreement. Regardless, the violation does not become a "substantial factor" in bringing about plaintiffs' terminations when defendants act solely to bring their business within the antitrust laws and to avoid further perpetuation of their wrongdoing. Plaintiffs cite no authority to the contrary.[53] Thus plaintiffs have failed to establish that their terminations as independent dealers were a proximate result, within the meaning of § 4 of the Clayton Act, of the price fixing violation.

Even assuming *arguendo* that such a proximate relationship existed, plaintiffs have also failed to prove an equally essential element of the fact of damage, viz., that each dealership had a real value as a going concern which was lost when the Dealer's Agreement was terminated. Plaintiffs have based their right to recovery solely on the federal antitrust laws and have not joined any pendent state law claims for wrongful termination or conversion. In view of the conclusion reached here that the dealerships had no actual value, and since therefore no fact of damage has been shown to exist, the Court need not decide the question whether, under California law, plaintiffs possess any proprietary interest in the dealerships which would survive the lawful exercise of contractual termination rights.

Plaintiffs' attempt to demonstrate both the existence of market value and the actual amount of that value rests almost entirely on a comparison of plaintiffs' dealerships to three *Sacramento Union* dealerships which have actually been sold in the past few years.[54] While "[e]xact comparability is neither possible nor necessary", Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., *supra,* 416 F.2d at 88, the evidence of comparability here is clearly insufficient to support a finding that plaintiffs' dealerships have any market value at all or that, assuming the fact of damage were shown by some other evidence, plaintiffs' dealerships are worth an amount similar to that paid for the *Sacramento Union* dealerships.

Plaintiffs contend that the two groups of dealerships are comparable because both involve distribution of newspapers (neither of which is the leading paper in its area) sold at similar prices through independent dealers and carriers to the homes of subscribers in the morning or afternoon. These comparable features

---

53. Nor do plaintiffs cite any authority in support of the proposition advanced during closing argument that principles of equity require a wrongdoer to bear the burden of any losses which occur as a result of his efforts to end his wrongdoing. Even if there were such an equitable principle, it is not clear how it could justify an award of treble damages in a case specifically brought under § 4 of the Clayton Act.

54. The date and net sale price of each of these sales is as follows:

| District #700 | #800 | Roseville |
|---|---|---|
| 4/1/70—$18,000 | 1/1/71—$17,000 | 6/1/70—$14,355 |
| 4/11/72—$41,962 | 10/1/71—$21,000 | |
| | 12/1/71—$22,420 | |
| | 12/1/72—$22,000 | |
| | 6/1/73—$27,500 | |

are far outweighed, however, by a lengthy list of dissimilarities most of which have a more significant impact on the saleability and value of a dealership than the factors urged by plaintiffs. The competition faced by the newspapers, for example, is entirely different. *The Sacramento Union* has only one significant competitor, the *Sacramento Bee*. *The Daily Review* and *The Argus*, however, face stiff competition from metropolitan dailies *(San Francisco Chronicle, San Francisco Examiner, Oakland Tribune* and *San Jose Mercury-News)*, other dailies *e. g., (Berkeley Gazette)*, and a number of free and controlled circulation newspapers and shoppers. The circulation of *The Sacramento Union* (approximately 107,000) is two and one half times that of *The Daily Review* (42,778 as of March 31, 1973, Exh. 30F) and approximately nine times that of *The Argus* (11,982 as of September 30, 1972, Exh. 34C). Larger newspapers can reap the benefits of economies of scale which favorably affect the unit ·cost of the newspaper and tend to reduce the publisher's need for circulation revenue. Plaintiffs do not consider this factor nor do they compare the relative financial needs and positions of the two publishers which can also have an effect on the present and future earnings of a dealership.

Of even greater probative value are the significant dissimilarities in the contract provisions which govern the respective dealerships. Since 1967 the *Sacramento Union* dealership contract has had a "vesting" provision which gives the dealer a property right in the dealership by virtue of payments made by him to the *Union* for the circulation contained in the district. The first sale of a *Union* city-zone dealership occurred on August 27, 1968, well after the vesting provision first appeared in the contract. The Court finds that this vesting provision, which is not present in the *Daily Review* and *Argus* contracts, was a significant factor in the development of a market for the *Union* dealership.[55] The *Daily Review* and *Argus* contracts permit termination on thirty days' notice with or without cause while the *Union* contract allows termination only for breach of contract and gives ·the dealer an opportunity to cure the default. The *Union* contract also requires that the dealer be given an opportunity to sell prior to the effective date of the termination. While it is true that sales of *Union* dealerships did occur under the old contract which permitted termination without cause on thirty days' notice, the record clearly indicates that the *Union* management represented to prospective dealers that this provision had not been and would not be enforced. Purchasers of ·the dealerships relied on that representation. (April 17, 1974, Tr., pp. 217–222.) *Union* dealers under both the old and new contracts are granted exclusive territories and are, therefore, insulated from all intrabrand competition on price and service. In contrast, ·there is no such exclusivity of territory in the *Daily Review* and *Argus* contracts. While plaintiffs conceded that the profitability of a dealership is dependent upon the wholesale rates charged by the publisher (April 24, 1974, Tr., pp. 62–63), ·they completely disregarded

---

55. Plaintiffs assert that it was the right to assign a dealership rather than the vested interest provision which created the market. They note that *Union* country-zone dealerships have been sold since June 1, 1970, despite the absence of a vesting provision in the country-zone contract. The Court finds that the market for the city-zone vested rights dealerships generated a secondary market for the country-zone dealerships. If mere assignment rights were sufficient to generate a market, one would have expected that a mature market would exist for *Daily Review* and *Argus* dealerships whose contracts have permitted assignment with the publisher's consent since 1963. No *Argus* or *Daily Review* dealership has ever been purchased, sold, transferred or assigned for value. Moreover plaintiffs ignore the fact that the management of the *Sacramento Union* has actively aided and participated in the development of a market for *Union* dealerships by supplying forms, making projections of revenues, expenses and profits, locating purchasers, etc.

the fundamental differences between the rate structure at the *Union* and the *Daily Review*. Thus, at the *Union,* the per unit cost of papers is inversely related to the volume of papers purchased. (Exh. 41C, Exhibit B—Rate Schedule.) At *The Daily Review,* on the other hand, wholesale rates are directly related to volume of purchases—when a dealer exceeds a stated number of papers, a second, higher rate is applied to all papers in excess of the stated amount. Moreover, the *Union* dealers themselves recognize that their new contract, which, *inter alia,* provides for termination only for cause subject to arbitration, is a "very good sales tool" which clearly enhances the marketability of their dealerships. (April 16, 1974, Tr., p. 73.)

Not only have plaintiffs failed to show sufficient comparability to permit the Court to find the existence of the fact of injury, these same deficiencies also undermine their attempt to use the sales of *Union* dealerships to estimate the dollar value of plaintiffs' dealerships. Moreover, in computing their estimated values plaintiffs have ignored both the fact that the price for *Union* dealerships have gradually increased as the market for them has developed and the special circumstances which surrounded the most recent purchases of the two districts (#700 and #800) on which they most rely. In the most recent sales of both of those districts, each had a unique value to the purchaser who already owned the adjacent district and was able to obtain by means of the purchase additional income without a significant increase in overhead. Thus plaintiffs' proof of going concern value based on the sales of the *Sacramento Union* dealerships is insufficient to establish either the fact or amount of damage on this claim.

Plaintiffs' claim that their dealerships have an actual going concern value also has a second major weakness. It is well established that the appropriate factors to be considered in measuring the "good will" or going concern value of a business are: "(1) What profit has the business made over and above an amount fairly attributable to the return on the capital investment and to the labor of the owner? (2) What is the reasonable prospect that this additional profit will continue into the future, considering all circumstances existing and known as of the date of the valuation?" Standard Oil Co. v. Moore, *supra,* 251 F.2d at 219; Simpson v. Union Oil Co., 411 F.2d 897, 908–909 (9th Cir.), *rev'd on other grounds,* 396 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1969). The evidence of record in this case indicates, however, that plaintiffs' dealerships have no such "additional profit" and therefore no actual going concern value. Plaintiffs have little capital invested in their dealerships. The value of each dealership is derived almost exclusively from the labor of the plaintiff-owner. Based on the salary level of defendants' original offer of employment to prospective district managers, the Court concludes that the $13,780 annual compensation is the amount "fairly attributable" to the labor of the owners of these dealerships. Plaintiffs' revised federal income tax-Schedule C's, or profit and loss statements, recently filed with plaintiffs' amended tax returns clearly indicate that the net profits [56] of their dealerships for the past several years are below and often substantially below that $13,780 figure.[57] Moreover, these

---

56. Since defendants' original employment offer includes reimbursement for travel and business expenses in addition to the $13,780 annual salary, the Court finds that plaintiffs' net profit is the appropriate comparison figure for the purpose of estimating the going concern value of the dealerships.

57. Only two plaintiffs (Jackson and Knutson) show net profits in excess of $13,780. For Knutson the excesses occurred in 1972 and 1973 while Jackson exceeded $13,780 net profit only in 1973. It must be remembered, moreover, that during a portion of 1973 these two dealers had increased their prices to carriers but the publisher had been restrained from increasing his price to them.

**1388**

past figures contain little indication that there is a "reasonable prospect" that there would be profits over and above the value of the dealer's labor in the future. This absence of a real going concern value within the parameters of Standard Oil Co. v. Moore, *supra*, precludes a finding that plaintiffs have established the fact of damage on this claim, and it further undermines plaintiffs' inadequate attempt to establish the comparability of plaintiffs' dealerships to those of *The Sacramento Union.*

Plaintiffs have failed to establish the requisite fact of damage for either their claim of lost profits or loss of going concern value. In addition, they have not demonstrated that there is a causal relationship between defendants' violation of Sherman Act § 1 and the claimed loss of going concern value. Since plaintiffs base their estimate of the amount of damages for lost profits and loss of going concern value on the same evidence presented on the fact of damage, the inadequacies in that proof render their estimates too speculative to support recovery. Consequently, plaintiffs are not entitled to the monetary relief which they request. A subsequent hearing will be held to determine whether plaintiffs shall be awarded reasonable attorneys' fees in this case.

## VI. EQUITABLE RELIEF

Plaintiffs also seek extensive equitable relief which, for example, would require defendants to continue to sell newspapers at the established rate to plaintiffs as independent contractors for a minimum period of six years unless good cause for termination is shown. In order to be entitled to injunctive relief under Clayton Act § 16, 15 U.S.C. § 26,[58] plaintiffs must "demonstrate a significant threat of injury from an impending violation of the antitrust laws

or from a contemporary violation likely to continue or recur." Zenith Corp. v. Hazeltine, 395 U.S. 100, 130, 89 S.Ct. 1562, 1580, 23 L.Ed.2d 129 (1969). Injunctive relief is designed to prevent continuing or future wrongs, not to punish past acts. United States v. Oregon Med. Soc., 343 U.S. 326, 333, 72 S.Ct. 690, 96 L.Ed. 978 (1952). The only antitrust violation found in this case was the resale price fixing component of the old Dealer's Agreement which plaintiffs concede has not been in effect since September 1, 1973. While plaintiffs assert that defendants are continuing to fix resale prices by coercing the carriers, the record is devoid of credible evidence to support this contention. There is nothing in the record which suggests that the past violation is likely to recur or that there is in defendants' conduct any other impending antitrust violation. On the contrary, there is clear proof that defendants are diligently trying to purge their distribution system of the anticompetitive conduct and operate their business within the law.

From the nature of the equitable relief requested, it is clear that, in the guise of an asserted need to dissipate the effects of the past violation, plaintiffs seek to enjoin the termination of their Dealer's Agreements rather than any unlawful price restraints. This Court has found that in the circumstances of this case the terminations themselves were not an unreasonable restraint of trade nor were they in furtherance of any pre-existing unlawful restraint. Accordingly, plaintiffs' request for injunctive relief must fail since "[a]n injunction can issue only after the plaintiff has established that the conduct sought to be enjoined is illegal and that the defendant, if not enjoined, will engage in such conduct." United Transportation Union v. Michigan Bar, 401

---

**58.** Clayton Act § 16 provides in pertinent part:

"Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief * * * against threatened loss or damage by a violation of the antitrust laws * * * when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity * * *."

U.S. 576, 584, 91 S.Ct. 1076, 1081, 28 L.Ed.2d 33 (1971).

 Moreover, having taken into account the balance of equities, the Court finds that the relief sought by plaintiffs is inappropriate. At the time plaintiffs were notified of the terminations of the Dealer's Agreement, they were offered employment by defendants on very favorable terms and conditions. Defendant Sparks testified that the continuation of the current dual distribution system would have an adverse effect on the financial condition of *The Argus* and *The Daily Review*.[59]

While declining to order equitable relief in the form requested by plaintiffs, the Court will continue in effect the stipulated temporary injunction until October 1, 1974 to enable plaintiffs to give due consideration to the offer of employment in light of the Court's rulings herein or to make other plans.[60] Pursuant to this temporary injunction defendants will be required to offer employment as district managers to each of the plaintiffs unless good cause can be shown by defendants for withdrawing the offer. The question of whether good cause has been shown will be subject to binding arbitration with the arbiter or arbiters to be chosen by the mutual agreement of the parties or by the Court if the parties cannot agree. In addition, all plaintiffs who do not accept employment or who are not hired will be required to return to defendants all current and updated documents and information concerning subscribers, carriers, paper drops, and other information regarding service within their district which they received at the time they became dealers for defendants.

The foregoing constitutes the Court's Findings of Fact and Conclusions of Law as required by Rule 52(a), Federal Rules of Civil Procedure.

Defendants are directed to prepare a form of judgment in accordance with this memorandum of opinion.

---

59. This testimony was also supported by *in camera* testimony and examination of certain of defendants' financial statements.

60. It should be noted that the Court orally advised the parties of its decision on July 18, 1974 and then presented a draft of this opinion to them on July 26, 1974. These facts are interjected lest it might appear that insufficient time existed between the rendering of this final written decision and the October 1, 1974 expiration date of the stipulated temporary injunction.